ANTHONY AKELIS AND RITA K. AKELIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Akelis v. Commissioner
Docket No. 25280-84.
United States Tax Court
T.C. Memo 1989-182; 1989 Tax Ct. Memo LEXIS 178; 57 T.C.M. (CCH) 213; T.C.M. (RIA) 89182; April 24, 1989. *178 Ps reported a distributive share of losses and investment tax credits allegedly generated by KJP, a limited partnership formed to acquire and commercially exploit the motion picture entitled "Black Harvest." Held, Ps failed to establish that KJP purchased and commercially exploited the film with an actual and honest objective of turning an economic profit. Accordingly, KJP's loss is disallowed pursuant to I.R.C. sec. 183, and KJP's property fails to qualify as "section 38 property" for purposes of the investment tax credit. I.R.C. sec. 48(a)(1). Anthony Akelis, pro se. Rebecca T. Hill, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Chief Judge: Respondent determined *182 deficiencies in petitioners' 1975, 1977 and 1979 Federal income taxes in the amounts of $ 13,656.97, $ 5,727.00 and $ 4,133.97, respectively. The determined deficiencies are entirely attributable to disallowed losses and investment tax credits claimed by petitioners with respect to their participation in a partnership allegedly marketing the motion picture entitled "Black Harvest." The sole issue for decision is whether petitioners' reported distributive share of partnership losses and credits is allowable. Resolution of this issue requires us to evaluate whether the corresponding losses and credits will be respected for tax purposes at the partnership level. FINDINGS OF FACT Petitioners resided in Hillsborough, California, at the time they filed their petition. Investment in K J Project II
During the years in question, Anthony Akelis (hereinafter referred to as petitioner) was employed full-time as a pilot by Western Air Lines, Inc. During the summer of 1975, petitioner was introduced to the world of investing in motion pictures by Kenneth L. Johnson (Johnson), another full-time pilot with Western Air Lines. Johnson, in addition to his piloting responsibilities, was *183 President of K J Investments, Inc. ( "KJ"), the general partner of the K J Project II partnership ("KJP"). KJP was formed to "acquire by purchase or production, distribute, lease and otherwise deal" with the completed feature film entitled "Black Harvest." Johnson was looking for investors to become limited partners in the venture. He presented petitioner with a prospectus, a 30-page tax opinion letter and other promotional materials. Included in the KJP promotional materials was a reprint of an article appearing in the August 25, 1975, issue of Business Week. This article lauded the tax benefits enjoyed by investors in film partnerships, including "the 10% investment tax credit on your share of the entire cost of the film;" the ability "to write off both your own contribution in cash and the amount borrowed to swing the deal;" and the "one chance in seven of earning some money on an investment, and one chance in 10 of backing a box-office smash." Petitioner was favorably impressed with the KJP materials and committed, subject to review of the prospectus by his tax attorney, James M. Sullivan, to acquire for $ 10,000 one of ten limited partnership units in KJP. Sullivan subsequently *184 advised petitioner that "the project is designed solely and specifically for the purposes of a "tax write-off' and don't expect to either sell your limited partnership interest or to generate much funds out of this movie over the next five years." Recognizing that the promised tax benefits would shift the investment's risk of loss to the government, petitioners executed a Certificate of Limited Partnership and contributed the required $ 10,000. "Black Harvest" is a contemporary story set in the Appalachian Black Mountains of Kentucky. The film was produced and its screen play was written by Christian Blackwood. It features a cast which stars Bibi Besch, Richard Bright and Rue McClanahan. The film's plot unfolds in a coal mining community. The local citizens are exploited by mine owners and forced to eke out a humble existence. Local farmers find their land ravaged by strip mining which is forced upon them by some unusual court decisions and ruthless coal operators. To this community comes Monica, an expectant mother and mid-twenty-year-old German widow of an American soldier, to live with her deceased husband's parents until her child in born. Monica finds in America the *185 same lonesomeness and frustrations she had faced in Germany and had hoped to escape by marrying an American. After the birth of her child, Monica has an affair with her deceased husband's brother Don, a representative of the mining interests. Monica soon discovers Don's ruthless nature -- he having killed various persons by pushing their cars off of mountains with an earth mover. Eventually, the town rallies to stop Don from strip mining the area. In the final scene, Don mounts an earth mover and attempts to run over a group of citizens who have established a roadblock. As he bears down on the group, Don is shot dead by his father. The rights to "Black Harvest" were initially owned by the German production corporation BMC Films GNBH ("BMC"). During November, 1975, Donald L. Reynolds (Reynolds), President of Golden Films, Inc., entered into negotiations on behalf of KJP to acquire certain rights to the film. On December 18, 1975, Christian Blackwood, President of BMC, agreed to transfer rights in the film to KJP. The agreement was, however, contingent upon KJP's entering into a promotion and distribution agreement with Golden Films, Inc., and advancing a minimum of $ 15,000 *186 to fund such activities. The transfer of film rights to KJP was consummated in a signed but undated agreement "made effective August 25, 1975." Pursuant to this agreement, KJP acquired from BMC an exclusive right to exploit "Black Harvest" within the United States and "English-speaking" Canada for a purchase price of $ 730,000, composed of a $ 15,000 cash payment and a 10-year, noninterest bearing, nonrecourse promissory note in the amount of $ 715,000. The purchase price was recommended by Reynolds and his associates after evaluating the film. The principal amount of the note executed by KJP, however, failed to clearly correspond to the agreement; but rather obligated KJP to pay BMC $ 580,000. The terms of the note provided that approximately 50 percent of the film's net revenues (after payment of the costs of prints, advertising, exhibitor screenings, shipping and handling, out-of-pocket travel and distribution fees not to exceed 35 percent of revenues) were to be applied to reduce the note balance. Payments due under the purchase agreement were to be remitted monthly for the first 36 months of the agreement and quarterly thereafter. Any remaining principal would become payable *187 at the end of the tenth year. In the event of default, BMC reserved the right to accelerate the loan and, pursuant to a security agreement, to foreclose on the motion picture. KJP did not participate directly in purchase negotiations or in any subsequent promotional or distribution activities. Johnson told petitioner that he lacked expertise with regard to the motion picture industry and was relying on Reynolds to direct the venture. Johnson did, however, retain a management fee of $ 25,000 or 25 percent of the capital contributions of the limited partners. Golden Films through Reynolds, its president, contracted with KJP to provide all promoting, distributing and marketing responsibilities of "Black Harvest." In return for providing these enumerated services, Golden Films was to receive a fee from the film revenues amounting to reimbursement of its direct expenses plus 50 percent of all remaining revenues after subtracting the reimbursements. An additional $ 10,000 agent fee was paid to Reynolds. Despite this significant financial interest in the film's success, during the next 20 months Golden Films failed to print any additional copies of the film, to line up play dates *188 or to create promotional or advertising materials. Notwithstanding the absence of promotional activities by Golden Films, KJP considered the Black Harvest venture a success. In April, 1976, Johnson wrote all investors that: NOW that YOU have seen how a movie investment actually works, perhaps you should consider reinvesting your 1975 [tax] refund check and going into another 1/2 or full unit. Depending on your personal situation, this should produce the net effect of eliminating your total tax liability. Similarly, Johnson included the following opening paragraph in his July, 1977, investor's report: TAX REFUNDS: We trust that your investment in this film has again been advantageous and your 1976 tax refund check has already reached you. In an effort to commercially exploit "Black Harvest," KJP terminated its agreement with Golden Films on August 29, 1977, and hired Phil Pine (Pine) of P-M Films to take over the film's distribution. Pine determined that "it [was] impossible to do anything with Black Harvest without [$ 5,000] to prepare it for distribution." Because KJP failed to raise additional funds from its limited partners, no distribution funds were advanced *189 to Pine, and Black Harvest was not commercially exploited. Disallowance of Reported Losses and Credits
Petitioners reported their distributive share of KJP's alleged losses in the amounts of $ 15,885, $ 10,321 and $ 8,246 on their respective 1975, 1977 and 1979 tax returns. Petitioners also claimed $ 6,050 of investment tax credits (ITC) on their 1975 return. The claimed ITC was attributable to petitioners' $ 60,500 distributive share of the property allegedly placed in service by KJP during the year. On March 21, 1977, KJP sent petitioners an amended Schedule K-1 (Form 1065) attributable to the partnership's 1975 tax year. The amended schedule reported petitioners' distributive share of partnership loss to be $ 14,117 and distributive share of qualified ITC property to be $ 73,000. On May 9, 1977, petitioners amended their 1975 return to reflect a $ 1,768 decrease in the amount of claimed KJP loss and a $ 1,250 increase in the amount of claimed ITC. Petitioners' 1975 amended return claimed an additional refund of $ 625. During early 1982, petitioners amended their 1977 and 1979 returns to claim additional depreciation deductions on rental real estate in the respective *190 amounts of $ 289 and $ 843. These latter amendments were unrelated to petitioners' investment in KJP. Respondent determined in a statutory notice of deficiency mailed April 12, 1984, that petitioners were not entitled to losses or ITC attributable to their participation in KJP. Petitioners disagreed and timely sent a petition for redetermination by certified mail on July 10, 1984. A copy of the filed petition was served on respondent on August 1, 1984. Notwithstanding the timely filed petition, respondent, on September 3, 1984, assessed income tax deficiencies of $ 13,656.97, $ 5,727.00, and $ 4,133.97 for petitioners' respective 1975, 1977 and 1979 tax years. Corresponding interest deficiencies in the amounts of $ 14,438.74, $ 5,081.04, and $ 2,993.57 were also assessed. Shortly thereafter, petitioners began receiving collection notices. Petitioners called the Internal Revenue Service about the notices and were told not to worry, that if a petition had been filed, no collection would take place. Petitioners were not, however, successful in contacting anyone in the Service's Collections Department. Moreover, on November 4, 1984, and August 8, 1985, petitioners received "Final *191 Notice[s]" which threatened: If we do not receive your payment or if you do not contact our office, enforcement action may be taken at any time after 10 days from the date of this letter without any further notice to you. Salary or wages due you may be levied upon, as provided by section 6331 of the Internal Revenue Code, by serving a notice of levy on your employer. Bank accounts, receivables, commissions, or any other kind of income you have are also subject to levy. Property or rights to property, such as automobiles, may also be seized and sold to satisfy your tax liability. On August 15, 1985, petitioner met with Appeals Officer Robert V. Riley and provided him a copy of the "final notice." Mr. Riley immediately requested a "priority abatement" of the premature assessments be made. Petitioners were informed of Mr. Riley's request, but did not receive notification of the abatements. Finally, "after reading in the newspaper about how the IRS could seize your properties and all, [petitioners] got very nervous and decided [to pay the demand]." On December 31, 1985, petitioners remitted a $ 30,266.37 payment designated "interest only." On January 30, 1986, petitioners *192 remitted a second payment of tax and interest in the amount of $ 23,705.51. Moreover, in response to a state income tax assessment precipitated by the Service's disclosure of the premature assessments under section 6103(d) [1] to California taxing authorities, petitioners also remitted a $ 9,114 payment to the California Franchise Tax Board. OPINION The issue for decision is whether petitioners properly deducted and claimed their distributive share of losses and investment tax credits allegedly generated by KJP in conjunction with its purchase and exploitation of the motion picture "Black Harvest." Respondent disallowed the claimed losses on the basis that the KJP partnership failed to purchase and exploit "Black Harvest" with the requisite economic profit objective. Sections 162 and 212. Likewise, he disallowed claimed investment tax credits on the grounds that the film "Black Harvest" failed to qualify as property subject to investment credit. Should we find that KJP engaged *193 in its film investment activity with an economic profit objective, respondent alternatively argues that the depreciable basis of the film excludes the nonrecourse note; that no depreciation be allowed because the film was never placed in service; that no interest expense be allowed the partnership; and that partnership expenditures attributable to distribution expenses, production costs or management fees do not constitute ordinary and necessary business expenses. Based upon our holding that KJP did not pursue its investment in "Black Harvest" with an economic profit objective, we need not address respondent's alternative arguments. We consider first whether the purchase and promotion of the motion picture was an activity engaged in for profit under section 183. Because the activity was engaged in by a partnership, we inquire into the profit objective of the partnership itself, as reflected in the intent of the general partner at the beginning of the transaction. Polakof v. Commissioner,820 F.2d 321, 323 (9th Cir. 1987), affg. T.C. Memo. 1985-197; Taube v. Commissioner,88 T.C. 464, 480 (1987); Finoli v. Commissioner,86 T.C. 697, 722 (1986). *194 As respondent has determined that KJP lacked an economic profit objective, the burden falls on petitioners to establish the presence of such an objective. Rule 142(a). Section 183(a) generally provides that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter [sections 1 through 1399] except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether the activity is engaged in for profit shall be allowed, and section 183(b)(2) provides that deductions which would be allowable only if the activity is engaged in for profit shall also be allowed to the extent that gross income from the activity exceeds the deductions otherwise allowable under section 183(b)(1). An activity is not considered to be engaged in for profit unless deductions arising therefrom would be deductible under sections 162 (relating to trade or business expenses), 212(1) or 212(2) (relating to expenses incurred in the production or collection of income, or in the management, conservation, or maintenance of property held for the production *195 of income). Section 183(c). A showing that the activity was entered into with an "actual and honest objective of making a profit" will satisfy this standard. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). A taxpayer need not prove that his profit expectation is reasonable to establish that he engaged in the activity for profit; but he must establish that based upon the particular facts and circumstances at hand, he entered into or continued the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. at 645; section 1.183-2(a), Income Tax Regs. Profit in this context means economic profit, independent of tax savings. Estate of Baron v. Commissioner,83 T.C. 542, 557-558 (1984), affd. 798 F.2d 65 (2d Cir. 1986). To prevail in this case, petitioners must show that KJ, as the general partner of KJP, purchased "Black Harvest" with an actual and honest objective of making an economic profit. Such a showing is made by giving greater weight to objective factors, taking into account all of the facts and circumstances. *196 Finoli v. Commissioner,86 T.C. at 722; section 1.183-2(b), Income Tax Regs. A nonexclusive list of nine objective factors relevant to this inquiry is set forth in the regulations. These factors are: (1) the manner in which (the general partner) carried on the activity; (2) the expertise of (the general partner) or his advisors; (3) the time and effort expended by (the general partner) in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of (the general partner) in carrying on other similar or dissimilar activities; (6) (the general partner's) history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of (the general partner); and (9) the presence of elements of personal pleasure or recreation in the activity. Section 1.183-2(b), Income Tax Regs. All factors need not apply to an activity and no single factor is controlling. Section 1.183-2(b), Income Tax Regs.
Based upon our review of the record, petitioners failed to establish KJP's profit objective. We proceed with our analysis without dealing with each *197 of the factors set forth in the regulations; rather we will deal with the totality of the circumstances revealed by record as a whole. Taube v. Commissioner,88 T.C. at 480-481. First, the record discloses that KJ and its officers had no expertise in the motion picture industry, but relied exclusively on the expertise of agents such as Reynolds and Pine. And as the record contains no information regarding the qualifications of Reynolds and Pine, petitioners have failed to prove KJ operated KJP with any degree of expertise in promoting motion pictures. Second, the record fails to substantiate that KJ managed KJP in a manner consistent with generating an economic profit. Notably, KJ failed to obtain an independent appraisal of "Black Harvest." Rather, KJ relied exclusively on Reynolds and his associates "to appraise and evaluate the film and arrive at the projections and earnings potential reflected in the original investors prospectus." And while the record contains assumptions regarding profits at various revenue levels, these assumptions do not comport with the terms of the executed purchase and promotion agreements. The record fails to establish whether Reynolds *198 advised KJ of the probability of reaching a level of revenue necessary to generate a profit. We infer from the absence of effort put forth by Reynolds and Golden Films to distribute "Black Harvest," despite their substantial 50 percent interest in gross revenues, that Reynolds perceived the prospect of healthy revenues to be remote. Nonetheless, KJ blindly relied on Reynold's advice and committed KJP to pay $ 730,000 to acquire "Black Harvest." KJ failed, however, to discover a $ 135,000 understatement in the principal amount of the nonrecourse purchase note and failed to monitor the nonexistent promotional efforts of its agent, Golden Films. We find KJ's managerial shortcomings indicative of an indifference toward whether "Black Harvest" earned an economic return for KJP's investors. We further find KJ's equating of naked tax benefits to "how a movie investment actually works" in its report to KJP investors reflective of the partnership's real motive for acquiring rights to "Black Harvest": to generate tax benefits for its investors. KJ's concern was collecting its $ 25,000 management fee, not producing an economic profit for the partnership. In addition to finding no profit objective, *199 we find that KJP failed to generate any gross income from its activities. Consequently, KJP may not deduct depreciation, promotion and management fees, or any other expense requiring the existence of a profit objective. Section 183(b)(2). Petitioners have failed to establish that any portion of the KJP losses was attributable to items of expense not requiring a profit objective. Section 183(b)(1). Thus, we disallow the entire KJP loss claimed by petitioners in each year at issue. Our review of petitioners' original and amended tax returns reveals that petitioners claimed KJP losses in the amounts of $ 14,117, $ 10,321 and $ 8,246 during the respective years 1975, 1977 and 1979. Respondent's adjustments to income, as reflected on the statutory notice of deficiency, are limited to these amounts. We also disallow the full $ 7,300 of ITC claimed by petitioners on their amended 1975 return. The claimed ITC pertain exclusively to petitioners' distributive share of KJP's allegedly qualified property. For petitioners to properly claim ITC on property owned by KJP, they must establish that the property to which the credits relate was qualified as "section 38 property" in KJP's hands. *200 Section 702(b); section 1.702-1(b), Income Tax Regs.Section 48(a)(1) defines "section 38 property" to include "only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more." Since depreciation is not allowable with respect to property used in activities lacking the requisite profit objective (sections 167(a) and 183(a)), the property employed in KJP's activities cannot qualify for ITC. We note in concluding our discussion of this issue that respondent specifically disallowed $ 6,050 of ITC in the statutory notice of deficiency. Nonetheless, we believe his position articulated in the statutory notice, at trial, and on brief sufficiently placed the entire claimed amount at issue. Petitioners' claimed ITC are disallowed. Premature Assessments
We turn now to a matter which does not impact upon our redetermination of the deficiency determined by the Commissioner, but which we nevertheless consider to be a matter of sufficient gravity to warrant our discussing it here. Fifty-five days after petitioners certified mailed their *201 petition, which pursuant to section 7502(a) was deemed timely filed, respondent assessed the deficiencies previously determined by him, plus interest thereon, in contravention of section 6213(a). In general, that section prohibits the assessment and collection of tax and interest until the decision of the Tax Court has become final. Thereafter, petitioners received a series of collection notices over a period of a year and a half, notwithstanding petitioner's repeated protests, culminating in a written notice threatening levy and seizure of petitioners' property 10 days after the notice. California also assessed its tax based upon the notice of the IRS' (illegal) assessments. The IRS ultimately abated the assessments, but failed to notify petitioners of this fact. Petitioners paid the tax and interest claimed by the IRS prior to the trial of this case. Since then, Congress has passed and the President has signed the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647. Section 6243 of this Act, 102 Stat. 3749, amended section 6213(a) to confer jurisdiction on the Tax Court to enjoin the IRS from assessing or collecting deficiencies which are disputed by a taxpayer *202 in a timely filed petition. Suffice it to say that this Court will not hesitate to take injunctive action when asked to do so in future cases similar to this one and exact appropriate sanctions for failure to comply in a timely fashion. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code applicable to the years in question and all Rule references are the Tax Court Rules of Practice and Procedure.↩