T.C. Memo. 2012-115

UNITED STATES TAX COURT

LEE STOREY AND WILLIAM STOREY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10230-10.                    Filed April 19, 2012.

<u>Gregory Alan Robinson</u>, for petitioners.[*]

<u>Chris J. Sheldon</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined deficiencies in petitioners'

Federal income tax of $17,237, $123,414 and $119,191 for 2006, 2007 and 2008

---

[*]Brief amici curiae was filed by Michael C. Donaldson and Christopher L.
Perez on behalf of the International Documentary Association, Film Independent,
National Association of Latino Independent Producers, Women Make Movies,
National Alliance for Media Art and Culture and University Film and Video
Association.

respectively (years at issue).[1]  Respondent also determined petitioners liable for the

accuracy-related penalty under section 6662(a) for the years at issue.[2]

    We are asked to decide a number of issues regarding petitioner Lee Storey[3]

and her documentary film production activity, which turn on fact-intensive analyses.

The primary issue is whether petitioner, a law firm partner and full-time attorney,

was involved in the trade or business of film production under section 162 during

the years at issue.  We hold that she was engaged in the trade or business of film

production during each of the years at issue and that she was engaged in this

business for profit.  Next we must determine whether petitioner's elections under

section 181 were adequate regarding the years at issue so that her production costs

could be expensed.  We hold that they were.  We must then decide whether to

disallow certain of petitioner's expenses for lack of sufficient substantiation.  We do

not disallow them.  Finally, we are asked to decide whether petitioners are subject

to the accuracy-related penalty under section 6662(a) for the years at issue.  We

hold that they are not.

---

[1]Dollar amounts are rounded to the nearest dollar.

[2]All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[3]For convenience, we refer to Lee Storey as petitioner.

FINDINGS OF FACT

The parties have stipulated some facts.  We incorporate the stipulation of facts and accompanying exhibits by this reference.  Petitioners resided in Arizona when they filed the petition.

The deficiencies and penalties determined in this case relate entirely to petitioner's film production activity.  She produced a documentary film entitled "Smile 'Til It Hurts: The Up With People Story" (Smile 'Til It Hurts).  Smile 'Til It Hurts explores the peppy youth group Up With People, which began singing in the 1960s.  Up With People performers have traveled and sung around the world, have performed at four Superbowl half-time shows and have been parodied on television shows such as The Simpsons and Southpark.  Smile 'Til It Hurts considers the history of Up With People as a response by the religious movement Moral ReArmament to the liberal counterculture of the 1960s.  It further addresses changes to the group, its evolving historical, political and financial context, and its effects on individual members.  Petitioner's interest in this topic did not arise, however, until many years into her marriage to William Storey, who was an Up With People singer.

A. Prequel

Petitioner is of Cherokee descent and grew up in Michigan, where she was a blue collar worker at Ford Motor Company. She later studied at the University of Michigan, where she met her husband. The couple moved to California, where petitioner received a Bachelor of Arts in English and a Masters in American Indian Studies from the University of California, Los Angeles. Petitioner received a Juris Doctor from the University of California, Berkeley, School of Law in 1987.

Petitioner is the primary wage earner in her family. During the years at issue she was a name partner in her law firm, Moyes Storey Ltd. In 2008 petitioner became a partner in the law firm of Ballard Spahr LLP, where she leads the water law practice. The primary focus of petitioner's law practice is negotiating Indian water rights settlements and consulting with rural clients regarding the development of their water supply. Petitioner earned a substantial income from her law practice during the years at issue, totaling over $1 million.

Petitioner also has a strong interest in the arts. She directed theatrical productions in high school and maintained her involvement in theater even during law school. Petitioner directed and produced musical productions from 1998 through 2003 for a nonprofit organization she chaired. She produced a play called "Give a Dog a Bone" for that organization and had considered turning it into a film.

Petitioner is interested in bronze sculpture as well. She has received commissions for her bronze work but does not engage in sculpting as a business.

Petitioners have been married for over 30 years and have two adult children and four grandchildren. Years into their marriage, petitioner first learned that her husband had participated in Up With People as a teenager. Mr. Storey's involvement with this group sparked her interest in a topic that would ultimately become Smile 'Til It Hurts.

B. Lights, Camera . . .

Petitioner was considering converting the nonprofit organization's play into a film in 2003, when her children had just left home for college. Taking advantage of additional free time, she began to educate herself about filmmaking. Petitioner read extensively and took a sabbatical from her legal work to attend the New York Film Academy's (NY Academy) one-month filmmaking program to obtain hands-on experience. Petitioner's experience at the NY Academy taught her about the technical aspects of filmmaking and allowed her to meet individuals who would later work with her on Smile 'Til It Hurts. Petitioner also took filmmaking classes, including editing and DVD authorizing, at Scottsdale Community College.

On her way to the NY Academy, petitioner went to an Up With People alumni meeting with her husband. It was then that a "light bulb went off." She negotiated the rights to all of the archival footage of Up With People and then obtained the rights to Moral ReArmament's archival footage, both before the years at issue. She hired Ryan McCoy, a video production company owner who she met at the NY Academy, as a camera operator in 2004 to film interviews that petitioner conducted with Up With People alumni at a group reunion. With archival footage and some interviews under her belt, petitioner's filmmaking journey was underway.

C. Action!

Petitioner capitalized on the flexibility of her legal practice, working nights and weekends and taking off weeks as needed, to pursue her filmmaking journey.[4] Executive Producer Jack Lechner testified that petitioner spent an enormous amount of time producing Smile 'Til It Hurts during the years at issue, and we find that to be true. She began interviewing members of Up With People with Mr. McCoy in 2004 and ultimately conducted 400 hours of interviews. She performed

---

[4]During the years at issue, petitioner billed 30 to 35 hours each week on her legal practice and her schedule allowed for significant flexibility.

extensive research into Up With People and Moral ReArmament, and hired a professional research firm to assist with the forensic accounting research.

Petitioner produced a 30-second promotional pitch (a "teaser") in 2004 and 2005. She produced the first trailer for Smile 'Til It Hurts in 2006 that was distributed in a packet with advertisements regarding petitioner's filmmaking team. That year, petitioner was accepted to attend the Sundance Institute's Independent Producers Conference (Sundance Conference) in late summer. Petitioner attended classes and benefited from networking opportunities at the Sundance Conference. Smile 'Til It Hurts was "called out" during the Sundance Conference as a viable product with a timely and timeless topic.

In 2007 petitioner began what she described as "key production" of the Smile 'Til It Hurts documentary and completed the DVD the next year.[5] She sought to tell the Up With People story as a cautionary tale while still honoring youthful idealism. Her goal was to produce a documentary that was neither a "puff piece" nor a scandal-focused exposé. Instead, she sought to tell a compelling, credible story that would serve as a foundation for her career as a credible filmmaker.

---

[5]Production is one of the stages of filmmaking. Petitioner did not begin making the feature-length film until the end of 2006. She and her team were "in production" from the end of 2006 until the end of 2008.

Petitioner originally did not intend to feature her husband in Smile 'Til It Hurts, but her executive producer and co-producer encouraged her to do so. Mr. Storey's participation in the final version of the film lasted less than 4 minutes out of the total 79 minutes.

Petitioner conducted screenings of the Smile 'Til It Hurts "rough cut" in test markets to identify necessary improvements to the film. She and her team revised the film using feedback from the screenings. For example, petitioner followed Mr. Lechner's suggestion to remove a clip of Glenn Close, an Up With People alumna, because test market results showed that the famous actress distracted the audience from the film.

As she was finalizing the film, petitioner attended the invitation-only Independent Film Producers' Independent Film Week Conference (IFW Conference) in New York. The IFW Conference had a "rough cut lab" during which industry experts recommended improvements to the Smile 'Til It Hurts "rough cut."[6] The IFW Conference also featured a "short" of Smile 'Til It Hurts and a private screening for film festival programmers and film distributors.

---

[6]The lab provides a critical review of the "rough cut" version of the movie so that it can be further improved before the "fine cut" phase.

Petitioner completed the final cut of Smile 'Til It Hurts in December 2008 and launched it the next month. She also produced a foreign version at the request of her publicist that is 25 minutes shorter than the regular version and principally sold to foreign television markets.

D. Publicity

As Smile 'Til It Hurts neared completion, petitioner created a website at www.smiletilithurts.com with an attached blog linked to social networks. It was near this time that petitioner renamed her project, as her original working title, "Power and Passion: The Up With People Story," yielded inappropriate and off-topic websites when entered into internet searches.

Smile 'Til It Hurts was not completed until the end of 2008. Upon completion, petitioner began actively marketing Smile 'Til It Hurts by attending film festivals selected by consulting her sales agent. She launched Smile 'Til It Hurts at the Slamdance Film Festival in January 2009 and subsequently shortened the documentary from 82 minutes to 79 minutes. She and her team also attended functions at the Sundance Film Festival, which ran concurrently that year. Petitioner attended other film festivals around the country in 2009 as well, including the Florida International Film Festival, the Full Frame Documentary Film Festival, the

Newfest Film Festival, the Temecula Valley International Film and Music Festival, the First Glance Film Festival and the Rocky Mountain Women's Film Festival.

The next year she continued marketing at film festivals, including the Big Sky Documentary Film Festival, the Sedona International Film Festival, the Wisconsin Film Festival, the Tribeca Film Festival Documentary Series and Michael Moore's Traverse City Film Festival.[7]  During the screenings, petitioner made postcards, buttons and chapsticks for marketing.  She also distributed the screening version of Smile 'Til It Hurts.

After the film festival stage, petitioner started screening Smile 'Til It Hurts in specific markets selected in consultation with Films Transit.  Petitioner screened Smile 'Til It Hurts in Tennessee, Oregon, Washington, Arizona and California.

E. Applause

Petitioner and Smile 'Til It Hurts received awards at some of the film festivals.  As previously mentioned, Smile 'Til It Hurts was "called out" at the Sundance Conference as timely and timeless.  Petitioner later received the best director award at the First Glance Film Festival in 2009.  Smile 'Til It Hurts was

---

[7]Michael Moore is a filmmaker and author who has directed and produced some of the highest-grossing documentary films of all time.

among 18 films selected that year by the International Documentary Association for qualification for Academy Award consideration. The next year Smile 'Til It Hurts received a Special Jury Prize at Michael Moore's Traverse City Film Festival. Smile 'Til It Hurts has also been favorably reviewed in the press.

Petitioner has been selected to be seated on panels involving the making of documentaries. She has also been approached by at least two organizations and an individual about producing additional documentary films. She intends to do so but wants to see revenue from Smile 'Til It Hurts before starting a new project.

F. Credits

Petitioner's successes were shared with a number of experts, both formal members of her Smile 'Til It Hurts team and professional acquaintances. Petitioner sought the advice of CC Goldwater, producer of the documentary film "Mr. Conservative: Goldwater on Goldwater."[8] CC Goldwater introduced petitioner to people in the documentary film industry, reviewed petitioner's synopsis and consulted with her on budgets and costs associated with producing a documentary film.

---

[8]CC Goldwater, granddaughter of Senator and Republican presidential nominee Barry Goldwater, produced the documentary about his life.

Petitioner used the short, the trailer and her business plan to attract her professional team in 2006. She first met award-winning documentary filmmaker Bari Pearlman at the Sundance Conference that year. Ms. Pearlman, who had produced three documentaries and worked as a television producer, became the co-producer of Smile 'Til It Hurts. Ms. Pearlman introduced petitioner to Academy Award winning documentary producer Mr. Lechner, who was intrigued by petitioner's project and impressed by her preparations. He agreed to serve as executive producer for Smile 'Til It Hurts, a role that included introducing petitioner to relevant professionals, providing creative guidance and providing industry expertise on documentary filmmaking. Petitioner entered into written contracts with Ms. Pearlman and Mr. Lechner. Because they were in New York, she rented a facility there as the business office, for production and for post-production editing.

Petitioner retained and contracted with other professionals as well, including assistant editor Aimee Lyde, camera operator Telling Image Films, editors Enat

Sidi and Penelope Falk,[9] composer John Kimbrough, photography director Ezra

Bookstein[10] and public relations consultant Jeff Dowd.

Petitioner retained publicist and marketing firm Films Transit to guide her

during the film's "rollout" at the beginning of 2009.  Films Transit required

petitioner to produce a "foreign cut" for foreign television broadcasting.

G. The Fine Print

Armed with her experts' wisdom, petitioner leveraged her experience in her

primary profession to comply with the extensive legal requirements and obligations

of documentary film production.  Petitioner obtained licenses for every second of

the documentary film, including archival footage, music rights,

photographs,newspaper clips and headlines.[11]  She obtained a formal written release

---

[9]Enat Sidi was replaced by Penelope Falk as editor because petitioner wanted an editor that better appreciated the humor in Up With People.

[10]Ezra Bookstein won an Emmy Award in 1999 for outstanding documentary camerawork.

[11]Petitioner obtained licenses from various entities, including Up With People, Initiatives of Change, two licenses with North Star Media on behalf of Up With People, Moral ReArmament, NFL Films, John F. Kennedy Presidential Library and Museum, Los Angeles Times, Fremantle Media, PARS International (New York Times and Washington Post), Curtis Publishing (Saturday Evening Post), Daily Californian, BBC Worldwide Americas, Gettyimages, Denver Post, NBC News Archives, Harvard Crimson, Pasadena Tournament of Roses, ABC News Videosource, NI Syndication Ltd., Democrat and Chronicle, Perth Amboy Evening News, BT News @ Bell South, Special Rider Music, Robert Fleming and

(continued...)

to use each interviewee's image and statements on video. Petitioner obtained releases for the locations at which film was shot, including Allusion Studios, Balboa Park, Habitat for Humanity, Mission Point Resort and Qualcomm Stadium.

Petitioner also obtained extensive and varied insurance for Storey Vision and her Smile 'Til It Hurts project. She secured commercial general liability coverage and an "entertainment package policy."[12] She also obtained liability insurance for instances when she shot film "on location." Petitioner also made extensive financial arrangements to carry on and complete her Smile 'Til It Hurts project.

## H. Box Office Arrangements

Petitioner organized Storey Vision, LLC (Storey Vision), an Arizona limited liability company, in September 2005. Petitioner was the sole member and manager of Storey Vision, her film production company. She established a

---

[11](...continued)
Crisis Band. She purchased the license for a 10-second film clip of Peter, Paul and Mary singing in a park but then had to purchase a license from Bob Dylan because the song Peter, Paul and Mary were singing was one Bob Dylan wrote.

[12]Petitioner had to give the insurance company a business plan, a budget and an estimate of the film's value to secure coverage.

checking account, a savings account and a credit card for Storey Vision, each separate from any personal accounts.

Petitioner began to run numbers for Smile 'Til It Hurts in 2005 and first created a written business plan and timeline in 2006. She created written budgets for Smile 'Til It Hurts and modified them as her project progressed.

Petitioner sought investors for Smile 'Til It Hurts and provided them with substantial information about her finances and plans. She sought investments from the Ellman Companies and from wealthy individuals. Alumni of Up With People and Moral ReArmament offered her money. She refused the money, however, to maintain her independence.

Petitioner obtained loans for Storey Vision to finance Smile 'Til It Hurts when the potential investors fell through. Wells Fargo Bank, N.A. granted to Storey Vision a $250,000 business line of credit in 2007 that it renewed twice. Grammercy Investments, LLC granted to Storey Vision a $75,000 loan in 2007 as well. An individual, Ross Wilson, made a $125,000 loan to Storey Vision that year and renegotiated it years later. Petitioner has repaid some of these obligations from her personal funds and is responsible for the financial investment made in Smile 'Til It Hurts.

Petitioner owns all of the rights to the film and continues to expect that she will make a profit. She anticipated sales to DVD viewers, cable outlets, television outlets and educational institutions like universities and libraries. Her target market included the 20,000 Up With People alumni, the 450,000 families that hosted Up With People members, audiences in the 3,600 communities where Up With People performed worldwide and viewers of the four Super Bowl half-time shows in which Up With People performed. She intended to sell regular DVDs for $19.95 and educational DVDs for $200 to $250. Petitioner received her first screening fee of $250 for the documentary film in March 2010 from the Salem Film Festival.

I. Tracking the Numbers

Petitioner hired a bookkeeper to manage Storey Vision's finances. She retained the services of Kim Coe of Dynamic Accounting Solutions and regularly provided Ms. Coe with her receipts and financial records. Ms. Coe prepared financial records during the years at issue for Storey Vision, including general ledgers, profit and loss statements, balance sheets, expense reports, business spending reports, petty cash ledgers and quick reports. When Ms. Coe had questions about Storey Vision's expenses, petitioner responded to her inquiries with the requisite information.

Petitioner also retained an accounting firm, CBIZ, Miller & Wagner (CBIZ), to manage certain tax matters for her and for Storey Vision. Ms. Coe provided CBIZ with records so that CBIZ could prepare petitioners' personal income tax return, including a Schedule C, Profit or Loss From Business, with respect to Storey Vision. Through CBIZ, petitioners filed an initial section 181 election with their income tax return for 2006 and filed subsequent elections with their income tax returns for the other years at issue. CBIZ also prepared Forms 1099-MISC, Miscellaneous Income, for certain individuals working with Storey Vision during the years at issue.[13]

J. Sequel

Respondent audited petitioners' tax returns for the three years before the years at issue, questioning whether petitioner's documentary filmmaking activity was a business or a hobby, and ultimately concluded that there was no deficiency. Respondent then issued to petitioners the deficiency notice for the years at issue. Respondent determined the deficiencies and accuracy-related penalties against petitioners regarding the deductions petitioner claimed with respect to the film production activity. Petitioners timely filed a petition.

---

[13]Forms 1099 were prepared for music composers, editors, productions assistants, law firms, crew members, publicists, marketing specialists and others.

## OPINION

We must decide whether petitioner's documentary film production activity was a trade or business or a labor of love.  Respondent asserts that Smile 'Til It Hurts was the latter, a labor of love motivated almost exclusively by petitioner's desire to learn about her husband's past and to document this exciting part of his youth.  Respondent argues that petitioners are not entitled to deduct expenses from Smile 'Til It Hurts because petitioner embarked upon her film-making journey to fulfill her curiosity, not with the intent to make a profit.  Respondent further contends that petitioners did not adequately substantiate a number of alleged expenses and failed to make proper section 181 elections.  Respondent seeks to impose an accuracy-related penalty for each year at issue.

Petitioner admits that her husband's connection to Up With People sparked her interest in the subject matter of her documentary.  She argues, however, that she previously held an interest in filmmaking and thought this topic would have broad appeal.  She asserts that she was in the trade or business of film production during the years at issue and that her primary motive was profit.  Petitioners further contend that they adequately substantiated petitioner's Smile 'Til It Hurts expenses, made valid section 181 elections and should not be subject to accuracy-related penalties.

I. Trade or Business

We begin by fleshing out the central plot to determine whether petitioner may deduct film production expenses paid or incurred during the years at issue under section 162(a). A taxpayer generally may deduct ordinary and necessary business expenses paid or incurred in carrying on any trade or business. Sec. 162(a). The taxpayer must satisfy two criteria to be engaged in a trade or business. Namely, the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23 (1987).

We are satisfied that petitioner's film production activity was conducted with continuity and regularity during the years in issue. Petitioner credibly testified about the many evenings and weekends spent on film production, and her work product demonstrates time-consuming care and attention to detail. Nevertheless, a taxpayer must conduct the activity with the requisite profit motive or intent for the activity to be considered a trade or business. See id.

Petitioner argues that she engaged in her film production activity with the intent to make a profit and that her expenses for the years at issue were ordinary and necessary to her endeavor as a producer. Respondent maintains petitioner was not engaged in the trade or business of being a film producer, and, accordingly,

expenses incurred for the production of Smile 'Til It Hurts are not business expenses deductible under section 162(a). Rather, he argues, they are deductible only to the extent of the income derived from the activity under section 183. Because there was no income, respondent seeks to deny deductions for all expenses.

Petitioner bears the burden of proving by a preponderance of the evidence that she was engaged in film production for profit. See Rule 142(a). The decision in this case would be appealable to the U.S. Court of Appeals for the Ninth Circuit, absent stipulation to the contrary, so we apply that law. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). In that court, a taxpayer must show that profit was his predominant, primary or principal objective. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212; Vorsheck v. Commissioner, 933 F.2d 757, 758 (9th Cir. 1991); Machado v. Commissioner, T.C. Memo. 1995-526, aff'd without published opinion, 119 F.3d 6 (9th Cir. 1997). This Court considers whether an activity is engaged in for profit on a case by case basis, taking into account the facts and circumstances involved. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981). The taxpayer's expectation of profit need not be reasonable but it must be bona fide, as

determined from all the surrounding facts and circumstances.  See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without opinion, 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner, 72 T.C. at 425-426; sec. 1.183-2(a), Income Tax Regs.

We structure our analysis of whether an activity is engaged in for profit around nine nonexclusive factors.  Sec. 1.183-2(b), Income Tax Regs.  The nine factors are:  (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his or her advisers, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that the assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or recreation are involved.  Id.

No factor or set of factors is controlling, nor is the existence of a majority of factors favoring or disfavoring a profit objective controlling.  Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), aff'g T.C. Memo. 2007-309; Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), aff'g T.C. Memo. 1993-396; Golanty v. Commissioner, 72 T.C. at 426-427; sec. 1.183-2(b), Income

Tax Regs.  The individual facts and circumstances of each case are the primary test, with greater weight to be given to objective facts than to the taxpayer's statement of intent.  See Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726-727 (9th Cir. 1986), aff'g Lahr v. Commissioner, T.C. Memo. 1984-472; Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a) and (b), Income Tax Regs.  Moreover, certain factors may be given more weight than others because they are more meaningfully applied to the facts in this case.  See Vitale v. Commissioner, T.C. Memo. 1999-131, aff'd without published opinion, 217 F.3d 843 (4th Cir. 2000).  All nine factors do not necessarily apply in every case.  See Green v. Commissioner, T.C. Memo. 1989-436; see also Akelis v. Commissioner, T.C. Memo. 1989-182.

A. Manner in Which the Taxpayer Conducts the Activity

We begin with the first factor by considering whether petitioner carried on the film production activity in a businesslike manner.  See sec. 1.183-2(b)(1), Income Tax Regs.  Factors that may indicate a profit objective include whether petitioner had a business plan, made changes in an effort to earn a profit, maintained complete and accurate books and records, and advertised the film.  See Engdahl v. Commissioner, 72 T.C. at 666-667; Rinehart v. Commissioner, T.C. Memo.

2002-9; sec. 1.183-2(b)(1), Income Tax Regs. We find that this factor favors petitioner.

Petitioner created Storey Vision before the years at issue. Storey Vision maintained separate accounts and a business credit card. Storey Vision obtained commercial general liability coverage, an "entertainment package policy," and liability insurance for instances when petitioner shot film "on location."

Petitioner hired a bookkeeper, Ms. Coe, to prepare records, including general ledgers, profit and loss statements, balance sheets, expense reports, business spending reports, petty cash ledgers and quick reports. Petitioner also retained CBIZ, an accounting firm, to manage certain tax matters for her and for Storey Vision.

Petitioner created a written business plan and timeline in 2006 and modified her written budgets for Smile 'Til It Hurts as her project progressed. Petitioner had sought capital from investors to fund her project. She changed course when her efforts failed. Instead, she obtained a business line of credit from Wells Fargo Bank and other loans.

In addition to budgets and financing, petitioner modified her movie to increase profit potential. She conducted screenings of the "rough cut" of Smile 'Til It Hurts and made corresponding changes to the film. She changed the name

of the film when the original title yielded unexpected internet results. She changed editors when her original editor missed the humor that she sought to convey.

This humor, petitioner thought, would appeal to a large built-in audience. She anticipated sales to DVD viewers, cable outlets, television outlets and educational institutions like universities and libraries. Her target market included the 20,000 Up With People alumni, the 450,000 families that hosted Up With People members, audiences in the 3,600 communities where Up With People performed worldwide and viewers of the four Super Bowl half-time shows in which Up With People performed. She intended to sell regular DVDs for $19.95 and educational DVDs for $200 to $250.

Petitioner began marketing Smile 'Til It Hurts during the years at issue, even as the movie was being produced and finalized, and marketed it actively in later years. She produced the first trailer for Smile 'Til It Hurts in 2006 that was distributed with advertisements regarding petitioner's filmmaking team. As Smile 'Til It Hurts neared completion, petitioner created a website with an attached blog linked to social networks.

Once Smile 'Til It Hurts was completed, she began actively marketing it by attending numerous film festivals selected after consulting her sales agent. During

the screenings, petitioner made postcards, buttons and chapsticks for marketing. She also distributed the screening version of Smile 'Til It Hurts. After the film festival stage, petitioner started screening Smile 'Til It Hurts in specific markets selected in conjunction with her sales agent, Films Transit. We do not much rely on the marketing that occurred after the years at issue. We note nonetheless that it is consistent with the businesslike manner in which petitioner conducted her film production activity.

Petitioner treated her reputation as a filmmaker with the same businesslike attention. She sought balance in producing Smile 'Til It Hurts, as she feared that making an exposé or a "puff piece" would affect her credibility as a filmmaker. She also turned down offers of funding from alumni of Up With People and Moral ReArmament to protect her independence.

We specifically note our disagreement with respondent's assertion that Smile 'Til It Hurts was an exploration of William Storey's youth, rather than an undertaking for profit. William Storey's history in Up With People, which had been previously unknown to petitioner, certainly piqued her interest. His contacts and access to members of Up With People also facilitated her project. His appearance in the film is a small percentage of the total movie time, although compelling. His relationship to petitioner is not mentioned or otherwise noticeable in Smile 'Til It

Hurts.  We find that Smile 'Til It Hurts is not a tribute to or memoir about William Storey, as respondent argues.  Instead, we find that petitioner's efforts to make Smile 'Til It Hurts a financial success show a profit objective and that this factor favors petitioner.

### B. The Expertise of the Taxpayers or Advisers

The second factor also favors her as petitioner developed her own expertise and sought guidance from industry experts.  Sec. 1.183-2(b)(2), Income Tax Regs. Petitioner read extensively, attended the NY Academy's one-month filmmaking program and attended classes at Scottsdale Community College.  Petitioner also received expert feedback and otherwise consulted with experts at events she attended.  For example, she was accepted to attend the Sundance Conference in 2006, where she attended classes and benefited from networking opportunities.  She also attended the invitation-only IFW Conference "rough cut lab," during which industry experts recommended improvements to the Smile 'Til It Hurts "rough cut."

She received advice from individuals with relevant expertise, like CC Goldwater, and retained industry experts to work on Smile 'Til It Hurts.  Award-winning documentary filmmaker Ms. Pearlman became the co-producer of Smile 'Til It Hurts.  Academy Award-winning documentary producer Mr. Lechner agreed

to serve as executive producer for Smile 'Til It Hurts. Emmy Award winner Ezra Bookstein worked as her photography director. Petitioner also retained and contracted with other professionals, including assistant editor Aimee Lyde, camera operator Telling Image Films, editors Enat Sidi and Penelope Falk, composer John Kimbrough, public relations consultant Jeff Dowd and publicist and marketing firm Films Transit. We find that petitioner sought to educate herself and received expert advice on her film production activity, and this weighs in favor of her argument that she carried on the activity in a businesslike manner and for profit.

C. The Taxpayer's Time and Effort

The third factor focuses on the time and effort expended by the taxpayer in carrying on the activity. Sec. 1.183- 2(b)(3), Income Tax Regs. Petitioner spent numerous hours per week on her filmmaking activity during the years at issue. She billed 30 to 35 hours per week as an attorney and spent evenings and weekends on her Smile 'Til It Hurts project. Respondent emphasizes that petitioner was a partner at a law firm and suggests that her filmmaking activity could not rise to the level of a trade or business because she had a full-time job with significant responsibility. We disagree. Petitioner's position as a partner gave her flexibility to work on her filmmaking activity.

We have recognized that a taxpayer may engage in more than one trade or business at any one time. See Gestrich v. Commissioner, 74 T.C. 525, 529 (1980), aff'd without published opinion, 681 F.2d 805 (3d Cir. 1982); Sherman v. Commissioner, 16 T.C. 332, 337 (1951); Vitale v. Commissioner, T.C. Memo. 1999-131. It is also well settled that the term "trade or business" includes the arts. See Snyder v. United States, 674 F.2d 1359, 1363 (10th Cir. 1982); Vitale v. Commissioner, T.C. Memo. 1999-131. Furthermore, petitioner engaged qualified professionals to work on her Smile 'Til It Hurts activity as well. See sec. 1.183-2(b)(3), Income Tax Regs. The third factor favors petitioner as well.

D. Expectation That Property Used in the Activity Will Appreciate

Fourth, we weigh petitioner's expectation that the assets used in the filmmaking activity may appreciate. See sec. 1.183-2(b)(4), Income Tax Regs. The relevant assets to consider are petitioner's own documentary and her rights to historical footage from Moral ReArmament and Up With People. As previously discussed, petitioner expected and expects to make a profit from Smile 'Til It Hurts. She expects that this asset, the product of her filmmaking activity, will appreciate in value. She also expects that her rights to Moral ReArmanent's and Up With People's historical footage will increase in value as time passes and the members die.

Respondent argues that her rights to historical footage have zero value because she paid nothing to obtain them. Respondent also asserts that Smile 'Til It Hurts has no value because the film will not earn a profit, or even income, in the future. The value of the assets used in petitioner's Smile 'Til It Hurts activity is so closely tied to the larger question of profit potential for her activity that it limits the utility of this fourth factor. We will not put much weight on this factor. Instead we will treat it as slightly favoring petitioner to the extent that we view the praises and awards given to petitioner and Smile 'Til It Hurts as positive indications of potential value.

### E. Taxpayer's Success in Other Similar Activities

In considering the fifth factor, a taxpayer's previous success in similar activities may show that the taxpayer has a profit objective even though the current activity is presently unprofitable. See sec. 1.183-2(b)(5), Income Tax Regs. A taxpayer's success in other, unrelated activities also may indicate a profit objective. See Daugherty v. Commissioner, T.C. Memo. 1983-188 (taxpayer's diligence, initiative, foresight and other qualities that generally lead to success in other business activities indicate taxpayer had a profit motive for activity at issue). Smile 'Til It Hurts is petitioner's first filmmaking endeavor. This factor is therefore of limited utility. She is, however, a successful attorney who was a name partner at

her firm and then a partner at a larger firm. She also had success in her other artistic endeavors. Petitioner directed and produced musical productions from 1998 through 2003 for a nonprofit organization that she chaired and has received commissions for her bronze work. We treat petitioner's success as an attorney and accomplishments in the arts as favoring petitioner.

F. Taxpayer's History of Income or Losses and Amount of Occasional Profits

We examine the sixth and seventh factors, the taxpayer's history of income or losses with respect to the activity and amount of any occasional profits, in tandem. Sec. 1.183-2(b)(6) and (7), Income Tax Regs. Respondent argues that petitioner's record of continuous losses from her filmmaking activity mandates a finding that she was not engaged in this activity for profit. Petitioner argues that while her efforts as a filmmaker have not proven profitable to date, her hard work will be rewarded with substantial income as Smile 'Til It Hurts is now complete, has received extensive praise and is being marketed by Films Transit, her publicist and marketing firm. She also points to the market downturn during the last year at issue, the first year Smile 'Til It Hurts was screened, as an unforeseen circumstance that affected Smile 'Til It Hurts' profitability.

Petitioner did report a loss for each year of operation, and her income has been de minimis. Petitioner points us to two important facts in this case, however, that should be considered with respect to these losses. Losses during the initial or startup stage of an activity do not necessarily indicate that the taxpayer failed to conduct the activity for profit. See Engdahl v. Commissioner, 72 T.C. at 668; sec. 1.183-2(b)(6), Income Tax Regs. The three years at issue were petitioner's fourth, fifth and sixth years of producing Smile 'Til It Hurts. She completed the film at the end of this period. We treat the years at issue as part of the startup phase because she needed to complete the film before she could sell it and, on the record, this period is not unreasonably long. We also acknowledge that a startup period may be longer in the arts, depending on the taxpayer's facts and circumstances. See Churchman v. Commissioner, 68 T.C. 696 (1977); Waitzkin v. Commissioner, T.C. Memo. 1992-216.

Losses due to unforeseen circumstances beyond a taxpayer's control also may explain the taxpayer's failure to realize a profit. Sec. 1.183-2(b)(6), Income Tax Regs. Petitioner points to the changes in the economic markets during the years at issue, and we do note such a shift. We do not, however, quantify its impact.

We also note respondent's concern that petitioner refused financial support from Moral ReArmament and Up With People alumni. Respondent argues that she did not act in a businesslike manner because she incurred additional losses instead of accepting available funds. Petitioner claims that she refused this support to maintain her credibility and independence as a filmmaker. Ultimately, we do not find respondent's position compelling. We are not inclined to give much weight to the sixth and seventh factors in this instance because we find that petitioner was within a reasonable startup phase for her filmmaking activity during the years at issue.

G. Financial Status of the Taxpayer

Respondent argues that the eighth factor, the financial status of the taxpayer, negates petitioner's profit motive. Sec. 1.183-2(b)(8), Income Tax Regs. He asserts that her significant income from her legal career is sufficient to offset her filmmaking losses while maintaining petitioners' lifestyle. This factor favors respondent.

H. Elements of Personal Pleasure

The last factor looks to elements of personal pleasure or recreation. Petitioner admits that she enjoys both the practice of law and film production. Sec. 1.183-2(b)(9), Income Tax Regs. It is obvious that petitioner enjoyed filmmaking

and derived personal satisfaction in uncovering and sharing the history of Up With People. We note, however, that petitioner's enjoyment of the filmmaking activity is not sufficient to cause the activity to be classified as a hobby if other factors indicate that she engaged in it for profit. See sec. 1.183-2(b)(9), Income Tax Regs.

After considering all the facts and circumstances, we find that petitioner has shown that she engaged in her filmmaking activity for profit. We recognize some factors in this case that indicate the absence of a profit motive: petitioner has a history of losses, earns significant income from other sources and appears to enjoy filmmaking. These factors, however, are outweighed by the facts demonstrating that petitioner did engage in film production for profit. In addition to petitioner's testimony, which we found to be credible and forthright, the record shows an intent and effort by petitioner to engage in and continue in the filmmaking field with the purpose of producing income. We conclude that, during the years in issue, petitioner engaged in the filmmaking activity with the dominant objective and intent of realizing a profit.

## II. Section 181

Having determined that petitioner has engaged in a trade or business, we now turn to the issue of whether petitioners properly elected to immediately deduct the Smile 'Til It Hurts production costs under section 181, rather than to capitalize them.

### A. The Issue Before Us

Taxpayers must make an election under section 181 to immediately deduct production costs. Respondent failed to raise properly the validity of petitioners' section 181 elections in his deficiency notice and his answer.[14] Nevertheless, the parties both addressed the adequacy of petitioners' section 181 elections in their pretrial memoranda. When issues not raised by the pleadings are tried by express or implied consent of the parties, they are treated as if they had been raised in the pleadings. Rule 41(b)(1). Parties satisfy Rule 41(b) when they introduce the issue at trial and acquiesce in the introduction of evidence on that issue without objection. See LeFever v. Commissioner, 103 T.C. 525, 538-539 (1994), aff'd, 100 F.3d 778

---

[14]The only reference to sec. 181 in the deficiency notice was "[n]o depreciation is allowable if an election is made under IRC 181." This assertion merely restates the language of sec. 181(b). Respondent also failed to question the validity of the election in his answer.

(10th Cir. 1996). We treat the pleadings as if they raised the issue of the adequacy of petitioners' section 181 elections.

We do not, however, treat the pleadings as amended to raise the issue of petitioners' eligibility to make the section 181 elections. Respondent argues in his opening brief that petitioners were not eligible to make section 181 elections in the first place. We generally will not consider issues raised for the first time on brief where surprise and prejudice are found to exist. See Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 346–347 (1991); Seligman v. Commissioner, 84 T.C. 191, 198 (1985), aff'd, 796 F.2d 116 (5th Cir. 1986). We find that respondent's belated focus on eligibility creates surprise and prejudice. In conclusion, we treat the pleadings as if they raised the issue of the adequacy of petitioners' section 181 elections, but not the issue of petitioners' eligibility to make those elections.[15]

B. Burden of Proof

We note again that respondent did not determine petitioners' section 181 elections inadequate in the deficiency notice. When the Commissioner asserts a

---

[15]We do not therefore address respondent's assertion that petitioner began principal photography of Smile 'Til It Hurts before the effective date of sec. 181. We do note, however, that principal photography does not necessarily begin when the first camera rolls. We also note that principal photography might begin at different times for a documentary film focused on interviews and historical footage and for a dramatic narrative film with actors on a movie set.

new theory that requires taxpayers to present different evidence, he has introduced a new matter on which he bears the burden of proof. Rule 142(a); Achiro v. Commissioner, 77 T.C. 881, 890 (1981); Estate of Falese v. Commissioner, 58 T.C. 895, 898-899 (1972). The facts required to prove the adequacy of petitioners' section 181 elections are different from the facts required to establish whether petitioner was engaged in a trade or business. We hold that respondent asserted a new issue on which he bears the burden of proof. See Rules 142(a), 41(b)(1); Fleming v. Commissioner, T.C. Memo. 1985-165.

C. Background of Section 181

We now turn to section 181. This is the first time that we have been asked to review an election under this provision. This section was enacted to encourage production of films and television programs within the United States rather than abroad. American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108-357, sec. 244, 118 Stat. at 1445; S. Rept. No. 108-192, at 74 (2003). Congress noted that foreign Governments have offered tax and other incentives to entice production of U.S. motion pictures and television programs to their countries and that runaway production has been estimated to drain as much as $10 billion per year from the U.S. economy. S. Rept. No. 108-192, supra at 73.

To address this concern, taxpayers may elect to treat certain production costs of qualified films and television productions as expenses in the year the cost is incurred, rather than capitalizing and depreciating them. Sec. 181. An election must be made by the due date for filing the taxpayer's return for the year in which production costs are first incurred. Sec. 181(c)(1). The Commissioner provided guidance in a notice in 2006 and first issued temporary regulations on February 8, 2007. See secs. 1.181-1T through 1.181-6T, Temporary Income Tax Regs., 72 Fed. Reg. 6160-6164 (Feb. 9, 2007); Notice 2006-47, 2006-1 C.B. 892. The timing and manner of making section 181 elections under these sources differed in some material respects.

D. Timeliness of the Election

Respondent argues that petitioners did not make the election for the first year in which production costs were first paid or incurred. Petitioners counter that they could not make the election before 2006 because the temporary regulations disallowed the election until the first taxable year in which petitioner reasonably expected that the Smile 'Til It Hurts would be set for production, Smile 'Til It Hurts would be a qualified film and the aggregate production cost would not exceed the dollar limits specified in the temporary regulations (reasonable expectations requirements). See sec. 1.181-2T(a)(2), Temporary Income Tax Regs., supra. We

agree with petitioners. Respondent must abide by published guidance. See

Rauenhorst v. Commissioner, 119 T.C. 157, 183 (2002).

Respondent then asserts that petitioners were required to file an amended

return for the first year they claimed production costs or file a Form 3115,

Application for Change in Accounting Method, because the election must be made

for the first year costs are incurred. He cites section 1.181-2T(e)(1), Temporary

Income Tax Regs., supra, for this proposition. We find that paragraph (e)(1) is

permissive rather than mandatory.[16] Instead, we direct respondent to the published

guidance at section 1.181-2T(a)(3), Temporary Income Tax Regs., supra, which

describes a taxpayer timely making an election later than the year that production

costs are first incurred because he or she previously did not satisfy the reasonable

expectations requirements. In this case, the election must be made in the first year

that the reasonable expectations requirements are satisfied, and production costs

incurred before that taxable year are treated as deductible for the year the election is

---

[16]The relevant language states: "[i]f a taxpayer begins principal photography of a production after October 22, 2004, but first paid or incurred production costs before October 23, 2004, the taxpayer is entitled to make an election under this section with respect to those costs. If, before June 15, 2006, the taxpayer filed its Federal tax return for the taxable year in which production costs were first paid or incurred, and if the taxpayer wants to make a section 181 election for that taxable year". Sec. 1.181-2T(e)(1), Temporary Income Tax Regs., 72 Fed. Reg. 6162 (Feb. 9, 2007) (emphasis added).

made.  Sec. 1.181-2T(a)(3), Temporary Income Tax Regs., supra.  Again, we find that respondent's argument is contrary to his published guidance.

E. Adequacy of Information

Respondent next argues that petitioners' elections are invalid because they omit certain required information.  He identifies the following omissions:

(1) Filming date.  Respondent alleges that petitioners needed to provide a specific date that production costs were first paid or incurred.  Instead, petitioners' elections said that filming commenced in 2004.  Respondent argues that this date is crucial because petitioners are eligible to make a section 181 election only if principal photography began after October 22, 2004.  See sec. 1.181-6T(a)(1), Temporary Income Tax Regs.  Respondent also notes that 2004 may be an incorrect date because petitioners deducted certain expenses for 2003.

(2) Compensation.  Respondent asserts, and we agree, that certain information is missing in the 2006 election regarding qualified compensation, total compensation paid during the year and aggregate compensation.

(3) Declaration.  The regulations required petitioners to include in each election a declaration regarding the owner's expectations of setting the movie for production and keeping costs below the relevant thresholds.  Respondent notes that petitioners omitted this declaration in the election for 2006.

Petitioners argue that their section 181 elections satisfied the requirements for electing. We find that they were imperfect. Petitioners argue in the alternative that we should accept the elections as adequate by applying the doctrine of substantial compliance. Here we agree with them.

We may apply the substantial compliance doctrine and excuse a taxpayer from strict compliance with procedural regulatory requirements if the taxpayer substantially complied by fulfilling the essential statutory purpose. See, e.g., Am. Air Filter Co. v. Commissioner, 81 T.C. 709, 720 (1983); Tipps v. Commissioner, 74 T.C. 458, 468 (1980); Taylor v. Commissioner, 67 T.C. 1071 (1977); Hewlett–Packard Co. v. Commissioner, 67 T.C. 736, 748 (1977); Sperapani v. Commissioner, 42 T.C. 308, 330-333 (1964). Most cases in which we have applied the doctrine of substantial compliance involved alleged failures to make an election according to the applicable regulations. See Estate of Chamberlain v. Commissioner, T.C. Memo. 1999-181, aff'd, 9 Fed. Appx. 713 (9th Cir. 2001).

The critical question in determining whether to apply the substantial compliance doctrine is whether the requirements relate to the substance or essence of the statute. See Taylor v. Commissioner, 67 T.C. at 1077-1078. If so, strict adherence is required. On the other hand, if the requirements are procedural or directory in that they are not of the essence of the thing to be done but are given

with a view to the orderly conduct of business, they may be fulfilled by substantial, if not strict compliance.  See id.

Here, the statute gives no requirements beyond timely notifying the Commissioner of the intent to make an election.  The guidance and instructions in the notice and the temporary regulations are inconsistent.  We find on these facts that the omissions from petitioners' elections were not of the substance or essence of the statute.

We begin with respondent's first concern, the filming date.  Respondent's focus on petitioners giving a filming date of 2004 is unfounded.  Petitioners were required to provide the date that production costs were first paid or incurred.  See sec. 1.181-2T(c)(1)(ii), Temporary Income Tax Regs., supra.  Unlike the date that principal photography begins, this date is not crucial to the taxpayers' eligibility to make the election.  See sec. 1.181-2T(a)(2), Temporary Income Tax Regs., supra.  We note that the date of initial production costs did not need to be reported for a section 181 election under the guidance in Notice 2006-47, supra, further supporting the view that this element is not of the essence of the statute and that the error does not prejudice respondent.

We next consider respondent's concern regarding compensation information.  Respondent alleged, and we agree, that no information is provided in petitioners'

2006 election regarding qualified compensation, total compensation paid during the year and aggregate compensation. Petitioners argue that this information was not listed because the relevant sums were all zero. Indeed, petitioners' election for the next year indicates $172,897 of qualified compensation for 2007 and that same amount of current compensation and total-to-date compensation. This 2007 information is therefore consistent with their position that the relevant sums were zero in 2006. As a result, we find that their omission was not material to their election and does not prejudice respondent.

Finally, we consider respondent's concern that petitioners omitted the required declaration in 2006 regarding the owner's expectations of setting the movie for production and keeping costs below the relevant thresholds. Although they did omit this declaration, we find that they could have made it for 2006 and we note that they did make it for 2007 and 2008. Furthermore, their 2006 election did specify that Smile 'Til It Hurts would be a "qualifying film." Again, we note that this declaration was not required under the guidance in Notice 2006-47, supra. This further confirms that petitioners' omission here is not of the essence of the statute and does not prejudice respondent. In sum, we hold that petitioners' section 181 elections are adequate under the doctrine of substantial compliance.

III. <u>Substantiation</u>

We next turn to the issue of substantiation.  Respondent asks us to find that certain expenses were not adequately substantiated.  In his deficiency notice, respondent determined that "[s]ince this activity is not engaged in for profit, expenses are only allowed to the extent of income from the activity."  Respondent then provided three alternative positions, yet failed to raise substantiation either in the deficiency notice or in his answer.[17]

Respondent warned petitioners before trial of his intention to raise substantiation as an issue, albeit not much more than a month before.  We permitted respondent to raise the issue of substantiation.  Nevertheless, we agree with petitioners that respondent's assertion raised a new matter requiring different evidence.  We hold that respondent bears the burden of proof on the substantiation issue.  <u>See</u> Rule 142(a); <u>Schuster's Express, Inc. v. Commissioner</u>, 66 T.C. 588, 593-594 (1976), <u>aff'd without published opinion</u>, 562 F.2d 39 (2d Cir. 1977);

---

[17]The three alternative positions were (1) "Expenses incurred in establishing a business before the time business begins must be capitalized rather than deducted in the year incurred," (2) "[b]ecause we determined that the activity described on your Schedule C does not meet the guidelines of carrying on a trade or business within the meaning of Internal Revenue Code Section 162, we disallowed your loss" and (3) "[n]o depreciation is allowable if an election is made under IRC 181."

Achiro v. Commissioner, 77 T.C. at 890; Estate of Falese v. Commissioner, 58 T.C. at 898-99; Fleming v. Commissioner, T.C. Memo. 1985-165.

Respondent agrees that petitioners have properly substantiated over 70% of the Smile 'Til It Hurts claimed production expenses for the years at issue. He asserts, however, that $251,670 of the claimed expenses for the years at issue was inadequately substantiated. Respondent seeks to meet this burden of proving insufficient substantiation by noting that petitioner reported to the Spirit Awards a lower cost of producing the film than petitioners claimed on their returns. He notes that petitioner's preproduction summary budget does not match the expenses claimed on petitioners' returns. These arguments are of no moment. Preproduction summary budgets and statements to independent filmmaker awards are not substantiation, and inaccuracies in these items do not convince us that petitioners' copious documentation of expenses is incorrect.

Respondent's revenue agent identified sample substantiation records and the information that she found inadequate with respect to those records. On rebuttal, however, petitioner provided additional information about many of the questioned items. Respondent's revenue agent also described some of her audit documentation, which is included in the record. Petitioners' counsel, however, highlighted the limited relevance of the revenue agent's audit documentation.

In compensating for this weakness, respondent's brief had attached a 314-page appendix. Respondent's appendix sought to identify each instance of missing information from the hundreds of pages of substantiation petitioners provided. Statements in briefs do not constitute admissible evidence and may not be considered by the Court. See Rule 143(c); Bialo v. Commissioner, 88 T.C. 1132, 1140 (1987); Kwong v. Commissioner, 65 T.C. 959, 967 n.11 (1976); Perkins v. Commissioner, 40 T.C. 330, 340 (1963). Respondent's 314-page appendix, even if it were argument instead of evidence, causes the brief to exceed the page limits the Court established at trial. See Weiss v. Commissioner, T.C. Memo. 1995-70. We will not consider respondent's appendix as either evidence or argument and therefore we hold that respondent has not met his burden of proof on the substantiation issue.

## IV. Penalty and Conclusion

In conclusion and after considering all the facts and circumstances, we hold that petitioner has shown that she was engaged in the trade or business of film production. We hold that petitioners' section 181 elections are adequate and do not find their substantiation inadequate. Accordingly, petitioners are not liable for the accuracy-related penalty.

We have considered all arguments made in reaching our decision and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioners</u>.