WILLIAM HELLINGS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent, DOMINIC DEL GIORNO AND KATHLEEN DEL GIORNO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hellings v. Commissioner
Docket Nos. 18112-90, 18113-90
United States Tax Court
T.C. Memo 1994-24; 1994 Tax Ct. Memo LEXIS 29; 67 T.C.M. (CCH) 1988; January 24, 1994, Filed *29 Decisions will be entered for petitioners. For petitioners: Dermot F. Kennedy. For respondent: Ruth Spadaro. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Docket No. 18112-90 -- William Hellings:
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
1983
$ 10,824
$ 541
[1]
[2]
1984
5,810
291
[3]
[4]
1985
5,315
266
[5]
[6]
Docket No. 18113-90 -- Dominic and Kathleen Del Giorno:
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
1983
$ 10,458
$ 523
[1]
[2]
1984
5,667
283
[3]
[4]
1985
5,378
269
5[5]
[6]
*30 Respondent also determined that all of the deficiencies were due to tax-motivated transactions and, therefore, petitioners in each of these cases are liable for additional interest under section 6621(c) for each of the years at issue. The issues for decision are: (1) Whether petitioners are entitled to deduct losses arising out of their partnership, Two Party Yacht Chartering (the partnership), for the years 1983, 1984, and 1985. We hold that they are. (2) Whether petitioners are entitled to deductions under section 179 arising out of the partnership for the years 1983, 1984, and 1985. We hold that they are. (3) Whether petitioners are entitled to investment tax credits arising out of the partnership for the years 1983 and 1984. We hold that they are. (4) Whether petitioners are liable for increased interest under section 6621(c), and for additions to tax under 6653(a)(1) and (2), and 6661 for the years 1983, 1984, and 1985. We hold that they are not. All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT We incorporate *31 by reference the stipulation of facts, the second stipulation of facts, and the attached exhibits. At the time of the filing of these petitions, petitioner William Hellings (Hellings) was a resident of Norristown, Pennsylvania, and petitioners Dominic and Kathleen Del Giorno were residents of Aldan, Pennsylvania. Petitioner, Dominic Del Giorno, hereinafter will be referred to as Del Giorno. During the years at issue, Hellings and Del Giorno were shift workers at the Pennsylvania-New Jersey-Maryland Interconnection (PJM), a subsidiary of Philadelphia Electric Company (Philadelphia Electric). The two met for the first time in the mid-1960s when they worked together at the Philadelphia Electric Company substation division. They renewed their friendship in 1981, when they began working together at PJM. At PJM, Hellings had advanced from assistant interconnector dispatcher to shift supervisor. PJM had three shifts, the midnight shift from 11:30 p.m. until 7:30 a.m., the day shift from 7:30 a.m. until 3:30 p.m., and the evening shift from 3:30 p.m. until 11:30 p.m. Hellings and Del Giorno rotated through all three shifts, but they usually did not work the same shift. Generally, *32 they would only work together 4 or 5 days out of a 5-week cycle. Hellings and Del Giorno performed their work for PJM in what Hellings described as a "bunker two and a half stories underground with steel doors with locks on them and no windows." From 1983 through 1985, Hellings' salary at PJM ranged from about $ 54,000 to about $ 60,000. Del Giorno's and his wife's combined salaries ranged from about $ 57,000 to about $ 68,000 during that period. In 1980 or 1981, Hellings and Del Giorno were growing tired of shift work and were looking for a way to retire early. They discussed various types of investments and decided that they would enter the boat chartering business. Prior to working for Philadelphia Electric, Hellings was trained as a carpenter and Del Giorno was trained as an electrician. Hellings and Del Giorno determined that the boat chartering business would best utilize their skills. Both Hellings and Del Giorno were experienced sailors. In addition, the two considered the growth potential of the boat chartering business, the fact that they could work outside, and their ability to fully participate in the operation. In preparation for entering the boat chartering *33 business, Hellings visited his brother, a charter boat captain in the Virgin Islands, and looked at charter boat operations in that area. Hellings and Del Giorno also had discussions with various boat builders and charter operators in Camden, Maine, and Annapolis, Maryland. The two spoke with various boat owners who chartered their boats as well as chartering agencies. They also visited the 1982 Annapolis boat show and spoke with charter agencies there. In addition, prior to making their decision to enter the boat chartering business, Hellings and Del Giorno attended seminars on all aspects of operating a chartering business. Hellings and Del Giorno gathered data on the purchase price and financing of a 38-foot Ericson sailboat (Ericson 38). In addition, they gathered information about various other costs of operating a charter boat, and worked out a 5-year business plan for putting an Ericson 38 into the Northeast Wind Yacht Charters (NEW-YC) fleet. In making their calculations, the two took into account both potential chartering income and expected appreciation of the Ericson 38. Hellings and Del Giorno used their data to project the number of charters they would need to *34 make a profit on their charter boat operation. Hellings and Del Giorno showed their calculations to their accountant and discussed their projections with him. The accountant did not see any flaws in their strategy. Hellings and Del Giorno compared an Ericson 38 to an Ericson 35, and compared charter operations on the Chesapeake Bay (the Chesapeake) to those in Maine and in the Caribbean. They chose to locate their operation on the Chesapeake because it was close enough to their homes that they could participate in running the operation, including installing equipment, performing routine maintenance, and handling check-ins and check-outs for charters. In addition, they considered the popularity of the Chesapeake among sailors and the length of the sailing season there. Although the peak season for chartering sailboats on the Chesapeake in 1984 and in 1985 was from May 15 until October 20, based on their discussions with other charter boat owners, Hellings and Del Giorno believed they could obtain charters at least from April until November, and perhaps into December and January. Once Hellings and Del Giorno had decided on the Chesapeake as the location of their charter operation, *35 they chose to purchase an Ericson 38 because they determined that it would best suit their purpose. The Ericson 38 was well suited for sailing on the Chesapeake because it performs well in light winds and the keel configuration is appropriate for shallow areas which are common in the Chesapeake. It was also designed with all lines and sheets running aft, making it easy to control and maneuver. In addition, the Ericson 38 offered a tri-cabin configuration which Hellings and Del Giorno considered attractive for charters because it could accommodate families or two couples. After analyzing other comfort and safety factors, Hellings and Del Giorno determined that the Ericson 38 would be more popular with charterers than other models. Finally, Hellings and Del Giorno considered the reputation of the designer and the manufacturer of the Ericson 38. Bruce King, the boat's designer, is a well respected American designer, and Ericson, the manufacturer, had a wide network of dealers that could support the 10-year warranty on the Ericson 38. On November 29, 1983, Hellings and Del Giorno entered into a purchase agreement with the Bay Yacht Agency (Bay Yacht) for the purchase of a 1984 *36 Ericson 38 (the boat). The boat was originally purchased from the manufacturer by Bay Yacht on August 19, 1983, and was shipped by the manufacturer on September 22, 1983. Bay Yacht used the boat as a demonstrator in the Annapolis boat show on October 10, 1983. On October 18, 1983, Bay Yacht placed the boat in dry storage in the Annapolis Harbor Boat Yard. On December 21, 1983, Hellings and Del Giorno formed a general partnership called "the Two-Party Yacht partnership" (the partnership). Under the partnership agreement, Hellings and Del Giorno each owned a 50-percent interest in the partnership. The two opened a checking account for the partnership and maintained a ledger of income and expenses. On the same day they executed the partnership agreement, Hellings and Del Giorno closed on the sale of the Ericson 38 from Bay Yacht for $ 104,426. They made a downpayment of $ 9,426 and financed the remaining $ 95,000 through the Essex Credit Corporation with the Connecticut National Bank. The loan for the purchase of the Ericson 38 was secured by a security agreement on the boat in favor of the Essex Credit Corporation. At the time of the sale, the partnership entered into two charter *37 agreements with Bay Yacht, one for the period from December 22, 1983, through December 31, 1983, and one for the period from January 1, 1984, through January 30, 1984. The total charter fee for both periods was $ 3,000. Bay Yacht chartered the boat because they did not have another Ericson 38 in stock and they wanted to have a model available to show prospective buyers. The fee was worked out based on the regular rates in the area with a 19-percent discount because the boat would not be subject to the normal wear and tear of a regular charter. Under the agreement, Bay Yacht was not subject to any restrictions on the use of the boat and could have sailed her if it chose. At the time, the boat was fully equipped and charter-ready, except for sails which could be easily borrowed. Hellings and Del Giorno also agreed to continue to let the sales agents for Bay Yacht use the boat for demonstration sails provided they did not interfere with a charter. Hellings and Del Giorno entered into a charter agreement with NEW-YC for 1984 on December 30, 1983, and for 1985 on November 14, 1984. Under the agreements, NEW-YC agreed to act as the chartering agent for the boat. They chose NEW-YC *38 because that company permitted them to do their own maintenance and to handle check-ins and check-outs when it was feasible. In addition, NEW-YC permitted them to arrange private charters as long as they provided sufficient notice. Hellings and Del Giorno also were favorably impressed by the very visible location of the NEW-YC fleet in the harbor and by the proximity of the company's office to the boat slips. As soon as Hellings and Del Giorno purchased the boat, they began to prepare it for chartering and to make it more appealing to charter customers. They discussed with Nick Stark, the president of NEW-YC, ways to make the boat more attractive for chartering, including adding additional equipment. On December 21, 1983, they filed an application for a boat certificate with the State of Maryland. In early 1984, Hellings and Del Giorno entered into an agreement with Bay Yacht to have certain work done on the boat. The work included painting, equipment installation, and commissioning. On February 20, 1984, a depth sounder, VHF, seafurl, pedestal compass, and coast guard safety package were ordered for the boat. The sails were ordered on March 19, 1984, and new "V" berth cushions *39 were ordered on April 27, 1984. The Coast Guard issued a certificate of documentation for the boat on June 21, 1984. During the years at issue, the partnership maintained insurance on the boat for use as a charter boat. The boat was also covered by NEW-YC's yacht charter fleet insurance against any damage sustained by or caused by NEW-YC charterers. Hellings and Del Giorno used various methods to market their chartering operation. The partnership held a raffle every year, wrote newsletters, and advertised the boat in a local paper and their company publication. Hellings and Del Giorno also became sales associates for Bay Yacht. In addition, they developed a mailing list from raffle participants and customers they spoke with at boat shows. Hellings and Del Giorno sent promotional material to the people on their mailing list and encouraged them to charter the boat. They also publicized their boat with sailing clubs. The partnership participated in NEW-YC's promotional activities, including the company's open house. Hellings and Del Giorno attended owners' meetings to obtain additional marketing ideas, and consulted people at NEW-YC about how to make their boat more attractive *40 to charterers. They also checked the boat's logs after a charter and noted any problems the charterer had experienced. They would fix the problem and send a follow up letter to the charterer thanking him for his comment and explaining that the problem had been corrected. Hellings and Del Giorno spent a substantial number of hours running their chartering operation. On average they spent 15 to 20 hours per week on the operation. When they participated in a boat show, they worked 16 hours per day. When they were preparing the boat for the charter season, they sometimes worked 30 hours per week. The two carefully monitored their boat and complained to NEW-YC when they thought the company was not maintaining it properly. They kept ship's logs which contained information about the boat, about each charter, and about repairs and maintenance. Moreover, they sought ways to reduce their expenses, including doing their own paperwork for private charters and performing much of the maintenance and repair work on the boat themselves. Each year they worked out schedules to determine when each of them would be available to travel to Annapolis. In 1984 and 1985, the partnership kept the *41 boat commissioned until sometime in December. They had bookings as early as the beginning of April and as late as the middle of November. Hellings and Del Giorno used the boat for personal use on three occasion for trips of a day or two. Those occasions included a father-son sail and a sail for Hellings' brother, who had advised them on the purchase of their boat. At the end of the 1984 season, Hellings and Del Giorno re-evaluated their operation. They had the boat appraised and learned that it had increased in value. In addition, they looked into the feasibility of moving their boat to the Virgin Islands for the winter to increase revenue. However, they determined that such a move would be detrimental rather than beneficial. Hellings and Del Giorno continued to evaluate their operation to ensure that it was progressing. At the end of 1985, they reevaluated the operation and decided to continue because they felt the operation was growing appropriately. However, they decided to add more equipment and increase their promotional activities. Each year the partnership's bookings and revenue increased. The partnership incurred net losses for its 1983 through 1988 tax years in *42 the amounts of $ 20,997, $ 38,667, $ 34,453, $ 27,492, $ 27,288, and $ 8,097, respectively. In 1989, the partnership had net income of $ 1,017. The partnership again had a net loss in 1990 of $ 2,242. OPINION To decide the issues before us, we must determine whether the partnership's charter operation was an activity not engaged in for profit within the meaning of section 183. If it was, petitioners are not entitled to deductions for their partnership losses, nor are they entitled to deductions under section 179 or to investment tax credits. If we decide that the partnership's charter operation was an activity engaged in for profit, we must decide in which year the activity began. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable * * * under section 162 or under paragraph (1) or (2) of section 212." In order to show that an activity was engaged in for profit under section 183, petitioners must establish that Hellings and Del Giorno had an actual and honest objective of making an economic profit independent of tax considerations. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), *43 affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982) affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Their expectation of profit need not have been reasonable; however, they must have entered into the activity, or continued it, with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., lists the following objective factors to be considered in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity (i.e., whether the activity is carried on in a businesslike manner); (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity will appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) *44 elements of personal pleasure or recreation. These objective factors are to be given greater weight than petitioners' mere statement of their intent. No single factor is controlling; the issue must be resolved based on all of the facts and circumstances. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). We begin by examining the manner in which Hellings and Del Giorno operated their business. One indication of a business-like operation is the maintenance of complete and accurate books and records. Sec. 1.183-2(b)(1), Income Tax Regs.; Pryor v. Commissioner, T.C. Memo. 1991-109. Respondent argues that the partnership did not keep complete records because the ship's logs do not contain records of personal use by Hellings and Del Giorno, and there was no documentation of their trips to Annapolis to work on the boat. We conclude that the partnership kept sufficient records to indicate a profit motive for the operation. Hellings and Del Giorno maintained a ledger of income and expenses, kept logs of all charters, and made schedules of times when each would be available to travel to Annapolis. Although their personal *45 use of the boat was not recorded in the ship's logs, we believe their testimony that there were only three such occasions, and therefore, we find that lapse in the partnership's recordkeeping to be insignificant. In addition, Hellings' and Del Giorno's careful consideration of their ability to make a profit prior to beginning their chartering operation is an indication that they entered into the activity for profit. The evidence clearly shows that they worked out a 5-year projection and from that determined they could make a profit on their operation. Moreover, they advertised and sought innovative techniques for promoting their operation. They continually looked for methods to improve the boat and their service so as to make them more attractive to potential customers and for ways to cut their costs. Each decision they made was thought out and carefully considered. All of these factors indicate that the partnership operated its charter activity in a businesslike manner. We next consider the expertise of Hellings and Del Giorno and their advisers. Although neither Hellings and Del Giorno ever had been involved in a chartering operation prior to the years at issue, they were *46 both experienced sailors. They knew what would make the boat attractive to charterers and how to keep it in prime condition. Moreover, Hellings and Del Giorno consulted numerous experts in the chartering business both before and during the operation of their business. Respondent has two arguments on this point: (1) That the partnership's only adviser was Bay Yacht, the company that sold them the boat, and that advice was somehow biased because the company wanted the sale; and (2) that Hellings and Del Giorno must have begun their chartering operation as a tax shelter because one of the seminars they went to gave them information about the tax benefits of yacht chartering. The evidence does not support respondent's first argument. Hellings testified that he and Del Giorno consulted many people in the chartering business including boat owners, chartering agencies, and Hellings' brother, who was a charter captain. Respondent's second argument makes the mistake of imputing the motives of the seminar organizer to Hellings and Del Giorno. The seminar provided Hellings and Del Giorno with valuable information about the chartering business in addition to any discussion of the tax benefits. *47 There is no evidence that they attended the seminar to learn about how to use the boat as a tax shelter. We conclude that Hellings' and Del Giorno's utilization of experts in the chartering business is a further indication that they were operating their chartering business for profit. A further indication of Hellings' and Del Giorno's profit motive was the time and effort they put into the business. They routinely spent their time off from PJM in Annapolis checking-in and checking-out charterers and performing repairs and maintenance on the boat. Moreover, they spent additional time promoting their operation, including running raffles, placing advertisements, and sending out mailings to potential charterers. An additional factor we must consider is that Hellings and Del Giorno expected the boat to appreciate in value. The appreciation of the boat was a major consideration for them in making their decision to enter the chartering business. Moreover, their expectation was borne out initially; the boat did appreciate during the first 2 years they owned it. Respondent makes reference to NEW-YC's policy of dropping boats that were more than 5 years old as evidence that Hellings *48 and Del Giorno should not have expected their boat to appreciate; however, Nick Stark, who ran NEW-YC, testified that such a policy was never enforced. Hellings and Del Giorno never operated a similar business, and the record is unclear about their success in operating any dissimilar businesses. However, the record does show that the two were successful at PJM, and Hellings rose to the level of shift supervisor. We conclude that Hellings and Del Giorno were responsible and had the skills necessary to run a business. The next two factors we must consider are the history of income and losses with respect to the activity and the amount of any occasional profits. The partnership had considerable losses during the first 5 years of operation from 1983 through 1987. In 1988, the partnership's loss was significantly smaller than it had been in previous years. In 1989, the partnership made a small profit and in 1990, it again had a small loss. Although it is true that the presence of losses during the early stages of an activity is not inconsistent with a profit motive, "the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but *49 also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The partnership's history of losses is some indication that Hellings and Del Giorno were not operating their chartering activity for profit. However, petitioners' financial status gives the opposite indication. Neither Hellings nor Del Giorno made large salaries and both had two children. While both probably made enough money to live comfortably, it is unlikely that they could afford to continue sustaining large losses without the expectation of eventually making a profit. Finally, we consider the elements of personal pleasure or recreation Hellings and Del Giorno got from their boat chartering operation. The two admittedly enjoyed sailing; nevertheless, they sailed the boat only three times during the years at issue. Most of the time they spent on the boat was spent dealing with charterers and repairing and maintaining the boat. Although they may have gotten some enjoyment out of those activities, we conclude that it was *50 not sufficient to negate their profit objective. After considering all of the above factors, we hold that Hellings and Del Giorno operated their boat chartering activity for profit. Respondent argues that even if we find that Hellings and Del Giorno operated their boat chartering activity for profit, petitioners were not entitled to depreciation deductions or investment tax credits in 1983 as they did not place their boat in service until 1984. A taxpayer is entitled to begin taking depreciation deductions on an asset when the asset is placed in service. Sec. 1.167(a)-10(b), Income Tax Regs. Similarly, a taxpayer is not entitled to an investment tax credit with respect to an asset until that asset is placed in service. Sec. 1.46-3(a)(1), Income Tax Regs. An asset is placed in service when it is "first placed in a condition or state of readiness and availability for a specifically assigned function". Sec. 1.167(a)-11(e)(1)(i), Income Tax Regs.
In the case before us, the specifically assigned function of the asset in question was use as a charter boat. At the time Hellings and Del Giorno purchased the boat, it was charter-ready. Although additional equipment was added later, *51 and the boat may not have been as attractive to prospective charterers at that time as it was after the additional equipment was added, the boat was sailable, and ready to be chartered. Moreover, the boat was chartered by Bay Yacht in 1983. Respondent argues that "the alleged charter was merely an attempt by petitioners, with the cooperation of the seller, to reclassify a portion of the cost of the sailboat as a 'charterback fee' in a thinly disguised attempt to create the appearance of activity in 1983." However, respondent presents no evidence in support of such a theory. Petitioners submitted as evidence a copy of the charter agreement between the partnership and Bay Yacht for the period from December 2, 1983, through December 31, 1983. In addition, both Hellings and Eric Smith, the president of Bay Yacht, testified that they had entered into a charter agreement because the company needed an Ericson 38 to show potential customers. The charter agreement placed no restriction on Bay Yacht's use of the boat, and the company could have used it for demonstration sails if it so chose. Respondent places much emphasis on the fact that the boat was not actually in the water when Hellings *52 and Del Giorno purchased it and was not placed in the water until April 1984. However, we do not find those facts to be controlling. The boat was in the water in October 1983 at the Annapolis boat show and sailed to the Annapolis Harbor Boat Yard, where it was placed in dry storage on October 13, 1983. Moreover, the charter agreement between the partnership and Bay Yacht did not restrict the company from placing the boat in the water and sailing it. The fact that the charterers did not choose to sail the boat does not change the fact that it was available for that purpose. Accordingly, we hold that the boat was placed in service in 1983. Petitioners are entitled to deductions for their distributable shares of partnership losses and deductions under section 179 arising out of the partnership for 1983, 1984, and 1985, and investment tax credits arising out of the partnership in 1983 and 1984. Given our holding with respect to the substantive issues, petitioners are not liable for any additions to tax. Decisions will be entered for petitioners. Footnotes
1. 50 percent of the interest due on $ 10,824.↩
2. 25 percent of $ 2,706.↩
3. 50 percent of the interest due on $ 5,810.↩
4. 25 percent of $ 1,453.↩
5. 50 percent of the interest due on $ 5,315.↩
6. 25 percent of $ 1,329.↩
1. 50 percent of the interest due on $ 10,458.↩
2. 25 percent of $ 2,615.↩
3. 50 percent of the intereat due on $ 5,667.↩
4. 25 percent of $ 1,417.↩
5. 50 percent of the interest due on $ 5,378.↩
6. 25 percent of $ 1,345.↩