T.C. Summary Opinion 2013-90

UNITED STATES TAX COURT

JOHN CHARLES GEYER AND CHRISTIN TERESA WILDFEUER, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21974-11S.                    Filed November 14, 2013.

<u>Derek W. Kaczmarek</u> and <u>Kacie Dillon</u>, for petitioners.

<u>Brandon A. Keim</u>, for respondent.

SUMMARY OPINION

LARO, <u>Judge</u>:  This case was heard pursuant to the provisions of section

7463 of the Internal Revenue Code in effect when the petition was filed.  Pursuant

to section 7463(b), the decision to be entered is not reviewable by any other

court, and this opinion shall not be treated as precedent for any other case.

In a notice of deficiency, respondent determined a deficiency of $3,915 in petitioners' Federal income tax for 2008. Petitioners resided in Arizona when they filed their petition. The only issue for us to decide is whether petitioners' travel guide and video sales activities were "activit[ies] not engaged in for profit" under section 183.[1] We hold that petitioners did not engage in those activities for profit.

Background

Petitioners are avid travelers. Before 1997 petitioners traveled in their first recreational vehicle (RV) throughout America and Mexico for personal pleasure on an average of three months every year. All in all, petitioners traveled over 100,000 miles on these trips. In 1997 petitioners purchased a second RV, also for personal pleasure, which they used to continue their yearly trips throughout America and Mexico. Currently, petitioners travel around two months per year in their RV.

While traveling in Mexico in 1999 petitioners learned about Adventure Caravans, an RV tour company. For each trip, Adventure Caravans contracts with independent contractors to serve as the wagon master or the tailgunner. The wagon master has primary responsibility for running the trip. Responsibilities

_____

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

include interfacing with customers, holding introductory meetings, and making arrangements for RV parks, meals, attractions, and tour guides. The tailgunner is an assistant who follows the RVs and helps resolve any problems that arise. Wagon masters are paid twice as much as tailgunners. To be eligible to be a wagon master for a particular trip, an individual must have served as the tailgunner for that same trip on a prior occasion. Finally, wagon masters, tailgunners, and customers travel in their own RVs.

For each trip, Adventure Caravans gives the wagon master a budget. Wagon masters are strongly advised to stay within this budget and must personally pay for unjustified cost overruns. Adventure Caravans pays wagon masters half of their contract price before the trip and the other half when the trip is complete. In addition, wagon masters and tailgunners receive tips from customers. Adventure Caravans sells the trips to customers and mandates certain attractions and social gatherings for each trip. In addition, Adventure Caravans provides wagon masters and tailgunners with the materials they need, including log books, finance books, and field staff manuals. Beyond that, wagon masters are free to plan additional attractions and social gatherings.

Adventure Caravans assigns trips to wagon masters and tailgunners on the basis of their preferences, customer evaluations from past trips, and their ability to

stay within budget. Every year, wagon masters and tailgunners complete a tour preference form in which they indicate their interest in and preferences for trips scheduled one or two years in advance.

After learning of Adventure Caravans, petitioners submitted an application, went to training classes, and were assigned to a trip. Adventure Caravans' training classes covered topics such as bookkeeping, couples counseling, foreign languages, marketing, and changing tires. In addition to attending Adventure Caravans' classes, throughout the years Mr. Geyer attended seminars and conventions on caravanning and mechanical work.

Travel guide activity

Petitioners went on their first trip with Adventure Caravans in 2000. For each year thereafter, petitioners led tours for Adventure Caravans, until their last trip in 2008. Petitioners testified that they stopped touring with Adventure Caravans after 2008 because it was not profitable and because Adventure Caravans did not offer them any more trips to lead. In their Schedules C, Profit or Loss From Business, for their travel guide activity for 2003 to 2009, petitioners reported their income and expenses as follows:

| Year | Gross income | Total expenses | Net profit or (loss) |
|------|------|------|------|
| 2003 | $8,158 | $8,573 | ($415) |
| 2004 | -0- | 414 | (414) |
| 2005 | 4,071 | 8,327 | (4,256) |
| 2006 | 7,390 | 6,775 | 615 |
| 2007 | 6,166 | 7,772 | (1,606) |
| 2008 | 11,382 | 27,637 | (16,255) |
| 2009 | 500 | 3,787 | (3,287) |

Petitioners kept two sets of books for their travel guide activity. In one set of books, petitioners kept track of money advanced by Adventure Caravans to pay for tour expenses such as RV parks, customer meals, and tour guides. In the other set of books, petitioners kept track of expenses that were not covered by Adventure Caravans. Petitioners also maintained a mileage log. In addition, petitioners sought and followed general business advice from their accountant, Mr. Pliska, including, specifically, the handling of expenses. However, petitioners did not have a business bank account for their travel guide activity, nor did they operate through a business name.

Although Adventure Caravans provides wagon masters with planning materials for each trip, petitioners found the materials inadequate and began keeping travel notes, which they referred to as their encyclopedia. In the encyclopedia, petitioners kept notes about each trip, including where to go, what activities to do, how long activities take, who to contact, what customers liked,

etc. Petitioners testified that they used the encyclopedia to improve their customers' experiences so that they would receive higher tips and better customer reviews.

Petitioners decided which trips to lead on the basis of their qualifications and the trip's profitability. Using these criteria, petitioners frequently led trips to Mexico. According to petitioners, they were more qualified to lead trips to Mexico because of their personal travels there. Petitioners further testified that trips to Mexico were more profitable because Mexico was close to their home in Arizona and because those trips lasted longer. Mrs. Wildfeuer further testified that although she had always wanted to lead a trip to Alaska, she decided against it because Alaska was too far away from them for such a trip to be profitable.

Video sales activity

In addition to guiding RV tours, petitioners also created videos of the trips, which they sold as tour memorabilia. To learn about filmmaking, petitioners attended seminars about creating successful videos and sought advice from Screen Play, the company from which they purchased their video equipment. Petitioners edited, narrated, and added music to the video footage of customers engaging in tour activities. In addition to selling the videos, petitioners used them for marketing purposes. Petitioners showed customers videos of other tours to

encourage them to sign up for additional tours. Footage from the videos was also shown during a television interview of petitioners. In their Schedules C for their video sales activity for 2003 to 2009, petitioners reported their income and expenses as follows:

| Year | Gross income | Total expenses | Net profit or (loss) |
|------|------|------|------|
| 2003 | $500 | $3,171 | ($2,671) |
| 2004 | 500 | 2,903 | (2,403) |
| 2005 | 1,200 | 2,529 | (1,329) |
| 2006 | 700 | 2,354 | (1,654) |
| 2007 | -0- | 1,898 | (1,898) |
| 2008 | 435 | 5,674 | (5,239) |
| 2009 | 800 | 2,301 | (1,501) |

2008 Panama trip

Petitioners served as the wagon master for Adventure Caravans' 2008 Panama trip. The Panama trip took place between January 17 and March 31, for a total of 78 days. As wagon masters, petitioners spent at least a month planning the trip. Destinations included the Mayan Ruins in Belize, the Messiah Volcano in Nicaragua, the Rain Forest Aerial Tram in Costa Rica, the Church of the Black Christ in Nicaragua, and the Panama Canal in Panama, as well as Mexico, El Salvador, Guatemala, and Honduras. The tour also featured margarita parties, rum parties, and potlucks. Typical days for petitioners started at 6 a.m. and lasted until 11 p.m. Petitioners created a video for the Panama trip with footage of the

customers and their activities. Petitioners reported sales income for the video on their 2008 and 2009 returns.

2008 Polar Bear trip

Petitioners served as tailgunners for Adventure Caravans' 2008 Polar Bear trip. As tailgunners, petitioners' primary responsibility was to ensure that their customers' vehicles were mechanically fit for the tour. The Polar Bear trip took place between September 24 and October 15, for a total of 22 days. Destinations included various towns in Canada, the Sam Waller Museum, and the Royal Canadian Mint. The tour also featured polar bear sightings and a wine and cheese party. As with the Panama tour, petitioners' typical day started at 6 a.m. and lasted until 11 p.m. Petitioners shot footage of the tour, but, because of low customer interest, did not make it into a video.

Petitioners' explanation for 2008 losses

Petitioners cited a number of reasons for their losses for 2008. First, petitioners explained that because they used the cash method of accounting, they reported half of their fee for the Panama trip on their 2007 return. Second, petitioners explained that their RV's radiator broke during the Panama trip, which cost them over $7,000 to repair. Third, petitioners explained that traveling to Mexico was more dangerous than usual in 2008, which resulted in fewer

customers than expected for their Panama tour.  Finally, petitioners explained that gas price increases in 2008 resulted in an unanticipated increase in their gas expense.

Other assets and sources of income

Mr. Geyer is an entrepreneur whose business endeavors include operating a paint store and painting business, flipping real estate, and running a ministorage business.  In 2008 Mr. Geyer owned an interest in a real estate partnership, which had an ownership interest in two apartment buildings (Glen Garden and Glen Garden 2) and a strip center (Sunridge).  The partnership had business bank accounts for each of the three buildings.  Mr. Geyer's partnership responsibilities included supervising employees and the property management company.  In 2008 Mr. Geyer further owned and operated a mini-storage business which also had its own business bank account.  On their 2008 return petitioners reported income of $90,363 from Mr. Geyer's real estate activities.

## Discussion

Respondent disallowed certain expense deductions on petitioners' Schedules C for 2008 on the basis of his determinations that petitioners' travel guide and video sales activities were not engaged in for profit within the meaning of section 183.  Petitioners argue that their expenses are deductible under section

162 as ordinary and necessary expenses incurred in connection with petitioners' trade or business. For the reasons set forth below, we sustain respondent's determinations.

I.      Legal standard

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are in error. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 183(b)[2] generally limits an individual's deductions for an activity not entered into for profit to the amount of the activity's gross income. Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."[3] Section 162 allows a deduction for all the ordinary and necessary expenses paid or incurred in carrying on an activity which constitutes a trade or business of the taxpayer.

---

[2]Sec. 183(d) provides a presumption that an activity is engaged in for profit if certain criteria are met. Petitioners do not meet those criteria.

[3]Sec. 212 allows as a deduction all the ordinary and necessary expenses paid or incurred in carrying on an activity which is for the (1) production or collection of income, or (2) management, conservation, or maintenance of property held for the production of income.

The Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie but for the fact that it is a small tax case, see sec. 7482(b)(1)(A), has held that for a taxpayer's expenses to be deductible under section 162 or 212 (and thereby avoid the limitations of section 183), the taxpayer must demonstrate that his or her "predominant, primary or principal" objective in engaging in the activity was to realize an economic profit independent of tax savings. Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212.[4] The existence of such a profit objective is a question of fact to be determined based on the surrounding facts and circumstances. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); see also sec. 1.183-2(b), Income Tax Regs. While such an analysis necessarily requires an inquiry into the subjective intent of the taxpayer, we may also look to objective indicia to determine the taxpayer's true intent. See Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), aff'g Lahr v. Commissioner, T.C. Memo. 1984-472; see also sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine factors to be considered when ascertaining a taxpayer's intent. These factors are:

_____

[4]Although a small tax case is not appealable, the Court will nonetheless look to the law of the otherwise appropriate appellate circuit.

(1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer in carrying on the activity; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned by the taxpayer; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  No single factor is conclusive, and we may accord certain factors greater weight than others.  Golanty v. Commissioner, 72 T.C. at 426; Allen v. Commissioner, 72 T.C. 28, 34 (1979).

## II.    Travel guide and video sales activities

While we believe that petitioners honestly hoped to generate a profit from their travel guide and video sales activities, petitioners have failed to show that their activities were engaged in primarily for the purpose of making a profit.

### A.    Manner in which the taxpayer carries on the activity

The fact that the taxpayer carries on the activity in a businesslike manner may indicate that the activity is engaged in for profit.  Sec. 1.183-2(b)(1), Income Tax Regs.  Three common inquiries are considered in this context:  (1) whether the taxpayer maintained complete and accurate books and records for the activity; (2)

whether the taxpayer conducted the activity in a manner substantially similar to those of other comparable activities that were profitable; and (3) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability. Giles v. Commissioner, T.C. Memo. 2005-28, 89 T.C.M. (CCH) 770, 776 (2005); sec. 1.183-2(b)(1), Income Tax Regs.

With regard to the first subfactor, petitioners kept detailed records of their operations in accordance with advice from their accountant, including two separate books for expenses and a mileage log. However, there is no evidence that these records were kept for the purposes of "cutting expenses, increasing profits, * * * [or] evaluating the overall performance of the operation". See Golanty v. Commissioner, 72 T.C. at 430. Furthermore, petitioners did not operate under a business name, maintain a separate bank account,[5] introduce evidence of a business plan, or prepare "profit or loss statements, balance sheets, or financial break-even analyses" for their travel guide and video sales activities. See Lowe v. Commissioner, T.C. Memo. 2010-129, 99 T.C.M. (CCH) 1535, 1537 (2010) (holding that lack of separate bank account, business plan, profit or loss

---

[5]Tellingly, Mr. Geyer (and his partnership) did maintain separate business bank accounts and operate under business names for his real estate activities.

statements, balance sheets, and financial break-even analysis militates against finding that complete and accurate books and records were maintained); Hilliard v. Commissioner, T.C. Memo. 1995-473, 70 T.C.M. (CCH) 898, 901 (1995) (holding that taxpayer did not conduct his activities in a businesslike manner where he did not prepare a business plan or maintain a separate bank account); Heppe v. Commissioner, T.C. Memo. 1995-314, 70 T.C.M. (CCH) 63, 69 (holding that taxpayers did not operate their sailboat chartering activity in a businesslike manner where they did not formulate a business plan or make substantive financial projections before starting the activity); cf. Hellings v. Commissioner, T.C. Memo. 1994-24, 67 T.C.M. (CCH) 1988, 1992 (holding that taxpayers operated their activities in a businesslike manner where, among other things, they made five-year projections, sought innovative techniques to promote their operation, and continually looked for ways to cut costs).

With regard to the second subfactor, the record does not contain credible evidence as to how others in the industry conducted their activities.

With regard to the third subfactor, petitioners continually strove to improve their customers' experiences, in hopes of receiving higher tips, by keeping detailed notes of each activity in their encyclopedia and using it to inform their future tour plans. Petitioners also sought to increase profitability by requesting trips which

were of longer duration or shorter distances from their home. In addition, petitioners ceased guiding tours after 2008 because of the lack of profitability, although Mrs. Wildfeuer also testified that Adventure Caravans did not offer them additional tours.

In the light of the foregoing, we conclude that petitioners conducted their travel guide and video sales activities in a manner that was businesslike in some respects but not others. Consequently, this factor is neutral.

B. Expertise of the taxpayer or his advisers

"Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices." Sec. 1.183-2(b)(2), Income Tax Regs. With respect to their travel guide activity, petitioners completed training through Adventure Caravans in the fields of bookkeeping, couples counseling, marketing, and foreign languages. Furthermore, Mr. Geyer attended seminars and conventions on caravanning and mechanical work. With respect to their video sales activity, petitioners attended seminars regarding the production of profitable videos and sought extensive advice from the owner of

Screen Play, the company from which petitioners purchased their video equipment. This factor favors petitioners.

C.    <u>Time and effort expended by the taxpayer in carrying on the activity</u>

"The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit." Sec. 1.183-2(b)(3), Income Tax Regs.

Petitioners clearly devoted a substantial amount of time and effort in carrying out their travel guide activity. Where petitioners served as wagon masters, they began planning the tour at least one month before the tour's start date. Where petitioners served as either wagon masters or tailgunners, petitioners worked long days while on tour, often for 17 hours a day. In addition, petitioners also devoted much time and effort to filming, editing, and producing their travel videos. This factor favors petitioners.

D.    <u>Expectation that assets used in the activity may appreciate in value</u>

"The term 'profit' encompasses appreciation in the value of assets * * * used in the activity." Sec. 1.183-2(b)(4), Income Tax Regs. With regard to their travel guide activity, petitioners' primary asset is the RV which they purchased in 1997 for personal pleasure. Consequently, this factor favors respondent.

With respect to their video sales activity, the record is silent as to petitioners' expectations as to whether their video equipment would appreciate. Consequently, this factor is neutral.

E.     Success of the taxpayer in carrying on other similar or dissimilar activities

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable." Sec. 1.183-2(b)(5), Income Tax Regs. Mr. Geyer is a self-proclaimed entrepreneur who has operated a number of businesses in his career, including a paint store and painting business, a real estate business, and a mini-storage business. Although we have held that a taxpayer's success in unrelated activities may indicate a profit objective, see, e.g., Storey v. Commissioner, T.C. Memo. 2012-115, 103 T.C.M. (CCH) 1631, 1638 (2012), all of Mr. Geyer's prior enterprises bear some relationship to real estate, a business unlike petitioners' travel guide and video sales activities. Accordingly, this factor is neutral. See, e.g., Strode v. Commissioner, T.C. Memo. 2012-59, 103 T.C.M. (CCH) 1276, 1278 (2012).

F.    <u>Taxpayer's history of income or losses with respect to the activity and the amount of occasional profits, if any, from the activity</u>

A record of substantial losses over many years, coupled with limited potential for profit are important factors bearing on the taxpayer's intention. <u>Golanty v. Commissioner</u>, 72 T.C. at 426-427. Losses sustained because of unforeseen circumstances beyond the control of the taxpayer, however, would not be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.

Petitioners have a history of substantial losses and minimal, if any, profits for their travel guide and video sales activities. For their travel guide activity, petitioners reported a tax loss for every year between 2003 and 2009, with the exception of a minimal profit for 2006. We note, however, that in the light of the 50% limitation on deductions for meal and entertainment expenses, <u>see</u> sec. 274(n), petitioners suffered economic losses for all seven years. Even if petitioners did realize an economic profit in 2006, the minimal amount of this profit has little weight in establishing a primary profit motive. <u>See</u> sec. 1.183-2(b)(7), Income Tax Regs. ("An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in

for profit."). For their video sales activity, petitioners reported losses substantially in excess of income for all years between 2003 and 2009.

Petitioners argue that a number of special or unforeseen circumstances resulted in their 2008 losses. First, petitioners claim that they reported part of their 2008 income on their 2007 return because they used the cash method of accounting. However, despite having allegedly included 2008 income on their 2007 return, petitioners still reported substantial losses for their 2007 travel guide activity. Second, petitioners explain that their radiator repair expenses, increased gas prices, and safety concerns associated with traveling to Mexico decreased their profitability for 2008. While we credit this part of petitioners' testimony, none of these reasons account for petitioners' lack of profitability for every other year. This factor strongly favors respondent.

G. Financial status of the taxpayer

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Sec. 1.183-2(b)(8), Income Tax Regs.

For 2008 petitioners reported substantial income of $90,363 from Mr. Geyer's real estate activities and substantial losses of $27,637 and $5,674

respectively from their tour guide and video sale activities. We further note that petitioners clearly enjoyed RV traveling, and in the light of their annual practice of traveling several months in their RV, petitioners would likely have incurred significant traveling costs for personal pleasure with or without any tax benefit from their claimed business activity. See Lowe v. Commissioner, 99 T.C.M. (CCH) at 1539 (finding taxpayer husband would likely have incurred significant fishing costs for personal pleasure had he not started a competitive sport fishing business where the taxpayer wife made significant income and taxpayer husband fished recreationally long before he started fishing competitively.). This factor favors respondent.

H.     Elements of personal pleasure or recreation[6]

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. However, "[w]e also note that a business will not be turned into a hobby merely because the

_____

[6]Normally, our analysis of the recreational aspect of petitioners' video sales activity would be independent of the recreational aspect of petitioners' travel guide activity. However, petitioners claimed significant travel expenses with respect to their video sales activity, including: $2,654 in car and truck expenses, $1,500 in meals and entertainment expenses, and $585 in depreciation expenses. Consequently, we hold petitioners to their position that traveling is an ordinary and necessary aspect of their video sales activity.

owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

The personal pleasure or recreational aspect of petitioners' activities is undeniable.  Petitioners traveled in their RV for personal pleasure annually for several months a year before their association with Adventure Caravans.  Moreover, petitioners continue to travel in their RV for personal pleasure annually for several months a year after their association with Adventure Caravans ended.  Finally, petitioners admit that they enjoy traveling.  See also Hilliard v. Commissioner, 70 T.C.M. (CCH) at 901 (finding recreational element existed where taxpayers used the sailboat in their charter activities one weekend a month during the summer); Warden v. Commissioner, T.C. Memo. 1995-176, 69 T.C.M. (CCH) 2432, 2438 (finding recreational element existed where taxpayers enjoyed sailing and sailed recreationally for at least 20 years before purchasing their yacht for charter), aff'd without published opinion, 111 F.3d 139 (9th Cir. 1997).

Finally, our cases routinely hold that no primary profit motive exists where international travel is involved.  See, e.g., Wright v. Commissioner, 31 T.C. 1264 (1959) (holding taxpayers not entitled to deduct the costs of a trip around the world as ordinary and necessary expenses of writing a book about such travels for publication, since taxpayers had multiple purposes for making the trip, including

their personal interest and enjoyment), aff'd, 274 F.2d 883 (6th Cir. 1960); Bentley v. Commissioner, T.C. Memo. 1988-444, 56 T.C.M. (CCH) 215-3 (1988) (holding taxpayer not entitled to deduct costs of travel to Europe as ordinary and necessary business expenses of selling photographs from his trip), aff'd without published opinion, 908 F.2d 976 (9th Cir. 1990); Lesher v. Commissioner, T.C. Memo. 1987-345, 53 T.C.M. (CCH) 1333 (holding taxpayer not entitled to deduct costs of travel to Africa as ordinary and necessary business expenses of contributing articles to a travel guide in hopes of publication), aff'd without published opinion, 862 F.2d 304 (2d Cir. 1988); McGowan v. Commissioner, T.C. Memo. 1964-241, 23 T.C.M. (CCH) 1439 (holding taxpayer not entitled to deduct costs of a six-month hunting safari tour of Africa, India, and the Far East as ordinary and necessary business expenses of making hunting films), aff'd, 347 F.2d 728 (7th Cir. 1965).

III.    Conclusion

In the light of our foregoing analysis, we conclude that while petitioners sincerely hoped to profit from their travel guide and video sales activities, it was not their primary motive for engaging in those activities.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.